# United States Court of Appeals
## For the First Circuit

No. 23-1959

JOSE VICENTE PENAFIEL-PERALTA; MONICA LOURDES CASTRO-PINDA;
G.E.P.C.,

Petitioners,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Gelpí, Thompson, and Montecalvo,
Circuit Judges.

Kristian R. Meyer, with whom Kevin P. MacMurray and MacMurray and Associates were on brief, for petitioners.
Allison Frayer, Senior Attorney, Office of Immigration Litigation, with whom Brian M. Boynton, Principal Deputy Assistant Attorney General, Civil Division, and Jennifer Khouri, Senior Litigation Counsel, Office of Immigration Litigation, were on brief, for respondent.

August 12, 2024

**THOMPSON, <u>Circuit Judge</u>.** A land dispute between Jose Vicente Penafiel-Peralta ("Penafiel-Peralta") and his sister Sandra Penafiel ("Sandra") ended with Penafiel-Peralta, his wife Monica Lourdes Castro-Pineda ("Castro-Pineda"),[1] and their minor son G.E.P.C. being forced from their home in El Triunfo, Ecuador. Certain they had nowhere else to go in Ecuador, Penafiel-Peralta, Castro-Pineda, and G.E.P.C. fled to the United States, where Penafiel-Peralta applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), listing Castro-Pineda and G.E.P.C. as derivatives of his asylum application.[2] An Immigration Judge ("IJ"), though, denied those applications. The Board of Immigration Appeals ("BIA" and, collectively with the IJ, "the agency") then affirmed that denial

---

[1] For consistency with the spelling included on the cover pages of the parties' briefing, we use "Castro-Pinda" in this opinion's cover page as well. That said, it appears the correct spelling is "Castro-Pineda" so that's what we'll use throughout the body of today's opinion.

[2] To break down that legalese, when we say "derivative," we are referring to the fact that "[w]hen a noncitizen has been granted asylum, immigration law allows their spouse and children (who meet certain statutory criteria) to be granted asylum as derivatives." <u>Cabrera</u> v. <u>Garland</u>, 100 F.4th 312, 315 n.1 (1st Cir. 2024). So here, Castro-Pineda and G.E.P.C. sought asylum as derivative beneficiaries of Penafiel-Peralta's asylum application. However, because immigration law does not provide for derivative withholding of removal or derivative CAT protection, and because Castro-Pineda and G.E.P.C. did not file their own separate applications for immigration relief, "any decision on [Penafiel-Peralta's] applications for withholding of removal and CAT protection (either a grant or a denial) do not apply to them." <u>Id.</u>

- 2 -

on appeal.  A petition for review with this court followed, with Penafiel-Peralta, Castro-Pineda, and G.E.P.C. (collectively, "Petitioners") asking us to reverse the agency's determinations and grant them immigration relief.  For reasons we'll explain shortly, that's a request we cannot grant, so we deny the petition.

## HOW THE CASE GOT TO US

Drawing the facts from the administrative record,[3] Caz v. Garland, 84 F.4th 22, 25 n.2 (1st Cir. 2023), here's the complete picture of how Petitioners' case made its way to us.

*Life and Land Dispute in Ecuador*

Penafiel-Peralta grew up in El Triunfo, Ecuador, farming land that his family owned.  When he was about twenty-five years old, he met Castro-Pineda and they quickly became serious.  They married each other on December 29, 2010 and moved in together, "first living in a room."  After a few years of marriage, Castro-Pineda became pregnant and gave birth to their son, G.E.P.C., in December 2016.  With a newborn now in the mix, Penafiel-Peralta and Castro-Pineda knew they needed a place to raise G.E.P.C. and began looking for a home.

---

[3] The administrative record includes Penafiel-Peralta's "immigration-court testimony (which the IJ found credible), the record before the BIA and IJ, and their decisions." Paye v. Garland, No. 23-1426, 2024 WL 3439968, at *1 n.1 (1st Cir. July 17, 2024).  Neither Castro-Pineda nor G.E.P.C. testified, so the IJ made a credibility determination only as to Penafiel-Peralta.

Knowing that they were looking for a place to raise G.E.P.C., Sandra, who (to remind) is Penafiel-Peralta's sister, offered to sell them a piece of land she and her husband Luis Guzman ("Guzman") owned in El Triunfo. In early 2017, Penafiel-Peralta and Castro-Pineda took that offer, sold a few of their animals, "and gave all of the money [they] had" to purchase the land for about $4,500. At this time, neither Sandra nor Guzman gave Penafiel-Peralta and Castro-Pineda the deed to the land, but Penafiel-Peralta didn't think much of it because, after all, "this was [his] sister." Undeterred, Penafiel-Peralta built a home on the land for his family over the span of three months, where Petitioners lived peacefully for several years.

Things changed for Petitioners in 2021, when Sandra told them that they needed to leave the land. She informed them that they had not paid enough for the land and that one of Guzman's male cousins -- a former member of the Ecuadorian Army known as Borroso[4] -- was interested in buying the land. Penafiel-Peralta and Castro-Pineda tried to reason with Sandra and Guzman and even asked them to return the money they had given them for the land, but Sandra and Guzman did not budge (or return the money). The situation gradually worsened. For a few weeks, Petitioners refused to vacate the land. In response, Sandra became more "aggressive"

---

[4] The record reflects several spellings of Borroso's name, so we use what appears to be the most common spelling, Borroso.

and began "spreading rumors to those in [their] town, trying to exile [Petitioners]." Sandra went as far as calling Castro-Pineda "a bitch, a whore, a motherfucker, and would say other nasty things about her" such as "call[ing] her poor, hungry, lazy for not working, and that she was dependent on [Penafiel-Peralta]." To make matters worse, Sandra began "showing up in public wherever [Castro-Pineda] was . . . to intimidate her." "It was as if," Castro-Pineda herself described in a sworn, written statement, she "was being stalked."

Around June 2021, Borroso came to Petitioners' home, showed them the deed to the property (which was now in his name), and demanded that they leave "or else." Penafiel-Peralta stood his ground and told Borroso that they would not leave -- to which Borroso responded that they could "either leave on good terms, or [o]n . . . bad terms." Petitioners considered Borroso "very intimidating" and "extremely threatening" because he was "ex-military" and they "knew he had connections with the police and the government."[5] As a result, they understood Borroso's words

_____

[5] The evidence in the record as to the extent of Borroso's military service and alleged connections to the police and Ecuadorian government is sparse (to say the least). On cross-examination, when Penafiel-Peralta was asked how he knew Borroso was ex-military, he simply responded that he knew this through Borroso's Facebook profile, which included photos of Borroso in military uniform. Other than that tidbit of information, there's nothing else in the record to corroborate Borroso's time in the military or supposed connections with the police and the Ecuadorian government.

to mean "that he would kill [them] or severely harm [them] if [they] were to remain on [their] property."

Worried about what might happen to them, Petitioners went to stay with Penafiel-Peralta's mother, who reminded them that they had family in Massachusetts and would be safe there. While at Penafiel-Peralta's mother's house, Petitioners did not hear from Sandra, Guzman, or Borroso again. Petitioners ultimately decided to leave Ecuador and flee to the United States because they had "nowhere else to go in Ecuador" as "[a]ll of [Penafiel-Peralta's] family lived in [El Triunfo] and Borroso would be able to find [them]." For a few reasons, they never went to the police. With the deed now in Borroso's name and hand, he would be considered the owner of the land. And, "the police and the military army . . . [are] the same thing." In total, Penafiel-Peralta estimated that this whole ordeal with Sandra, Guzman, and Borroso lasted "[a]bout a month."

Petitioners arrived to the United States on or about July 26, 2021. Several months later, on January 11, 2022, the Department of Homeland Security ("DHS") initiated removal proceedings against them.

*The IJ's Decision*

Petitioners' removal proceedings got underway later that year, with their merits hearing before the IJ taking place on October 31, 2022. At that hearing, Penafiel-Peralta sought to

avoid removal through applications for asylum, withholding of removal, and CAT protection, and Castro-Pineda and G.E.P.C. sought to avoid removal through applications for just derivative asylum. To back up their claims and applications, Petitioners filed a legal memorandum, a report regarding the effects of trauma, many country conditions reports, sworn, written statements from Penafiel-Peralta and Castro-Pineda, and three letters of support from individuals familiar with what had happened to them in Ecuador, including one from Penafiel-Peralta's mother.

Once Penafiel-Peralta was done testifying (and, per the IJ, testifying credibly), the IJ issued an oral decision that very same day, denying Petitioners' applications for immigration relief across the board and ordering their removal to Ecuador. Petitioners' asylum application, according to the IJ, failed for three reasons. First, he explained that the harm that the Petitioners endured in Ecuador did not rise to the level of "persecution." In his view of the evidence, Petitioners were threatened twice (once by Sandra and once by Borroso) over a one-month period, during which no one was harmed or injured and no weapons were brandished. To the IJ, this didn't make the cut for persecution.

Second, the IJ didn't think Petitioners sufficiently established a connection (a/k/a "nexus" in immigration legalese) between the threats and any of Petitioners' four particular social

groups ("PSG"): (1) "Penafiel[-]Peralta Nuclear Family"; (2) "Ecuadorian Family Dispossessed of their Livelihood";[6] (3) "Ecuadorian Females"; and (4) "Ecuadorian Male Children." Rather, the IJ thought the record reflected that Sandra and Borroso threatened Petitioners because they wanted them off the land, not because of their membership in any of those PSGs. Third, the IJ reasoned that there was insufficient evidence in the record to suggest that the Ecuadorian government was unable or unwilling to protect Petitioners. He explained that Borroso, while ex-military, was never associated with the Ecuadorian government nor was he acting on behalf of the Ecuadorian government. Moreover, Petitioners never reported the threats to the police, which also cut against them on the unable-or-unwilling front.

Comparatively speaking, the IJ made much quicker work of Penafiel-Peralta's withholding of removal and CAT protection applications. Withholding of removal was quickly denied because it requires the same elements as asylum that the IJ found lacking but has a higher burden of proof. CAT protection was denied because there wasn't enough evidence in the record to show

---

[6] Just as an FYI because it's not actually relevant to our ultimate analysis, the IJ also determined that Petitioners' PSG of "Ecuadorian Family Dispossessed of their Livelihood" was not a valid PSG under immigration law because it was "too amorphous" and "lack[ed] social distinction."

Penafiel-Peralta would be tortured in Ecuador, either by a government official or with their acquiescence.

Petitioners then appealed to the BIA.

*The BIA's Decision*

That appeal, however, was to no avail, as the BIA dismissed the appeal on October 18, 2023. Right out of the gate, the BIA noted that Penafiel-Peralta had not challenged the IJ's denial of CAT protection and deemed any argument regarding that form of relief waived.[7] With CAT protection crossed off the list, the BIA turned its attention to the merits of Petitioners' asylum application and Penafiel-Peralta's withholding of removal application. It first affirmed the IJ's nexus determination, agreeing with the IJ that Petitioners were "threatened because of a personal dispute over land ownership and not on account of any of [their] four proposed [PSGs]." Responding to Petitioners' argument that they were targeted because of their family

---

[7] Besides a one-off, introductory sentence in Petitioners' briefing to us that Penafiel-Peralta has "established that [he is] . . . eligible for . . . CAT," nothing in their briefing either addresses the merits of Penafiel-Peralta's claim for CAT protection or challenges the BIA's determination that he waived any argument as to that form of relief. Such a failure to develop any argumentation means his claim for CAT protection is waived. See Sok v. Mukasey, 526 F.3d 48, 52 (1st Cir. 2008) (deeming CAT claim waived where petitioner made "no argument with respect to the . . . claim beyond an introductory assertion that '[t]he record establishes the merits of [her] claim[] for . . . protection pursuant to the [CAT]'" (first, second, and fourth brackets in original)).

- 9 -

membership, the BIA noted that Petitioners did "not point to any record evidence to establish that [their] family membership was or would be any more than a tangential reason for the harm." The BIA then affirmed the IJ's unable-or-unwilling determination because Petitioners never reported the threats to the police and had not offered any support for their subjective belief that Borroso had government connections that would shield him in the event he harmed them. In light of those two conclusions, the BIA affirmed the IJ's denial of asylum and withholding of removal.[8]

This timely petition for review followed.

## OUR THOUGHTS ON WHAT HAPPENED

It's time now for us to dig into the merits of the petition, which asks us to review the agency's decisions. Our review is usually focused on only the BIA's decision, as that "is the final agency decision on the books." Cabrera, 100 F.4th at 319. However, where the BIA adopts and affirms the IJ's decision but still analyzes some of the IJ's conclusions and adds its own touch, we review both the BIA's and IJ's opinions as one. Pineda-Maldonado v. Garland, 91 F.4th 76, 80 (1st Cir. 2024); Espinoza-Ochoa v. Garland, 89 F.4th 222, 230 (1st Cir. 2023). Such

---

[8] As the nexus and unable-or-unwilling determinations were dispositive of Petitioners' claims, the BIA explicitly did not reach their other arguments regarding whether the harm they suffered amounted to persecution or whether their "Ecuadorian Family Dispossessed of their Livelihood" PSG was legally cognizable.

- 10 -

is the case here, so we employ that standard of review as we tick through Petitioners' applications for asylum and withholding of removal.

*Asylum*

On appeal to us, Petitioners offer only two complaints regarding the agency's denial of asylum: (1) the agency erred in determining that Petitioners had not established a nexus to a statutorily protected ground, and (2) the agency erred in determining that Petitioners had not established the Ecuadorian government was unable or unwilling to protect them from harm. Some asylum-law basics will help place those alleged agency blunders in context.

To be asylum-eligible, a noncitizen must meet the statutory definition of a "refugee," defined, in pertinent part, as a person who can't or won't return to their native country "because of [past] persecution or a well-founded fear of [future] persecution on account of" at least one of the five statutorily protected grounds: "race, religion, nationality, membership in a [PSG], or political opinion." 8 U.S.C. § 1101(a)(42)(A); 8 U.S.C. § 1158(b)(1)(B)(i). Persecution in this context requires three elements: (1) the noncitizen suffered or will suffer harm that meets a certain level of severity; (2) there is a causal connection or nexus between the harm and one of the statutorily protected grounds; and (3) the harm must be a result of government action,

inaction, or inability or unwillingness to control the conduct of private parties. Martínez-Pérez v. Sessions, 897 F.3d 33, 39 (1st Cir. 2018); Guaman-Loja v. Holder, 707 F.3d 119, 123-24 (1st Cir. 2013).

So, in essence, Petitioners argue that they satisfied their burden as to the latter two elements -- the nexus and unable-or-unwilling elements -- notwithstanding the agency's views to the contrary. But, a failure to establish any of the three elements dooms an asylum application. Aguilar-De Guillen v. Sessions, 902 F.3d 28, 33 (1st Cir. 2018). To simplify matters, then, our analysis will begin and end -- it turns out -- with Petitioners' nexus argument because, concluding as we do, it doesn't persuade. See, e.g., Cabrera, 100 F.4th at 319 (addressing only outcome-determinative issue in asylum analysis); Caz, 84 F.4th at 27 (ditto).

With that, we turn to Petitioners' nexus argument, which is actually two-fold. First, they argue that the agency erred by failing to engage in a mixed-motive analysis. Second, they argue that the agency erred in finding that the record did not compel the conclusion that a statutorily protected ground was one central reason for the harm they suffered. We'll tackle each facet of their argument in turn, but first we lay out some helpful background on the nexus requirement.

A.

Recall that the definition of "refugee" requires past or anticipated persecution "on account of race, religion, nationality, membership in a [PSG], or political opinion." 8 U.S.C. § 1101(a)(42)(A) (emphasis added). The "on account of" language included in the "refugee" definition encompasses what is known as asylum law's "nexus" requirement. See Urgilez Mendez v. Whitaker, 910 F.3d 566, 570 (1st Cir. 2018). That requirement is satisfied where the noncitizen provides sufficient evidence that a statutorily protected ground was or will be "at least one central reason" for the harm they suffered or fear suffering in the future. 8 U.S.C. § 1158(b)(1)(B)(i). This "at least one central reason" language by definition "contemplates the possibility that multiple motivations can exist," so the existence of a non-statutorily-protected motivation does not necessarily cut off a noncitizen's asylum eligibility. Aldana-Ramos v. Holder, 757 F.3d 9, 18-19 (1st Cir. 2014). Indeed, as long as a statutorily protected ground is "at least one central reason" for the persecution, it need not be the sole, exclusive, or even primary reason for the persecution. Espinoza-Ochoa, 89 F.4th at 235; Loja-Tene v. Barr, 975 F.3d 58, 61 (1st Cir. 2020). That said, while mixed motives do not run afoul of the nexus requirement, the statutorily protected motive "cannot be incidental, tangential, superficial, or subordinate to another reason for [the] harm."

- 13 -

Barnica-Lopez v. Garland, 59 F.4th 520, 528 (1st Cir. 2023) (alteration in original) (quoting Sánchez-Vásquez v. Garland, 994 F.3d 40, 47 (1st Cir. 2021)) (internal quotation marks omitted).

As you might imagine, then, personal disputes, such as those motivated by revenge, money, or land, must be analyzed under this mixed-motive standard. See, e.g., Khalil v. Garland, 97 F.4th 54, 62 (1st Cir. 2024); Pineda-Maldonado, 91 F.4th at 85; Espinoza-Ochoa, 89 F.4th at 236-37; Ruiz-Escobar v. Sessions, 881 F.3d 252, 260 (1st Cir. 2018). Along these lines, while our precedent has long held that events arising "from personal disputes are generally not enough to show the required nexus," Sompotan v. Mukasey, 533 F.3d 63, 71 (1st Cir. 2008), we've also been careful to explain that, "if a personal dispute partially motivates a persecutor's mistreatment of an applicant, record evidence can nonetheless indicate that the applicant's protected status may be another central reason for the persecution," Khalil, 97 F.4th at 62-63 (cleaned up) (internal quotation marks and citation omitted).

Against this legal backdrop, we march onwards to our take on Petitioners' nexus arguments.

B.

First up, we have Petitioners' argument that the agency applied the wrong legal standard by failing to account for the possibility of mixed motives. Such a claim triggers de novo

- 14 -

review, Jimenez-Portillo v. Garland, 56 F.4th 162, 166 (1st Cir. 2022), which just means we review without any deference to the agency's reasoning. And under that standard of review, Petitioners' argument doesn't withstand scrutiny.

It is true that both the BIA and the IJ determined that Petitioners were threatened because of a "personal dispute over land ownership." It is also true that "the words 'mixed motive' and 'one central reason' do not appear at all in" either the BIA's or the IJ's decision. Espinoza-Ochoa, 89 F.4th at 236 (noting that the absence of such words suggests the agency did not engage in mixed-motive analysis). Be that as it may, the agency's decisions readily reflect that it engaged in the proper mixed-motive analysis.

Take the BIA's decision. In its analysis, it explained that Petitioners had "not point[ed] to any record evidence to establish that [their] family membership was or would be any more than a tangential reason for the harm." The use of "any more than a tangential reason" necessarily shows that the BIA considered the possibility of mixed motives. And if there were any doubt (there isn't), it specifically cited for that proposition the exact page number of our decision in Barnica-Lopez discussing the mixed-motive analysis. 59 F.4th at 528. Citations to the accurate legal standard is some (though not slam-dunk) evidence that the agency did what it was supposed to. See id. at 529. And

- 15 -

significantly, that's not all the BIA did. It also applied that standard to the record, citing specific facts to support its conclusion. See id.

Take next the IJ's decision. "Specifically, the IJ found that there was 'insufficient evidence' to conclude that" Petitioners were targeted because of a statutorily protected ground. Ferreira v. Garland, 97 F.4th 36, 49 (1st Cir. 2024). "Instead, the IJ found [the threats were] on account of other factors," id., as they were "forc[ing] [Petitioners] to vacate the land in an effort to evict them because the owners of the land, [Sandra] and then subsequently Mr. [Borroso], had legal title to the land and they wanted the land vacated."

Accordingly, in our view, the agency engaged in a mixed-motive analysis and, "based on the evidence presented, made a fact-specific determination that [Petitioners] had not shown that the persecution was motivated by a" statutorily protected ground. Barnica-Lopez, 59 F.4th at 529-30.

C.

Moving along, Petitioners next argue that, even if the agency engaged in the proper mixed-motive analysis, it nevertheless erred in concluding that Petitioners' membership in the "Penafiel-Peralta Nuclear Family" PSG[9] was not "at least one

_____

[9] While Petitioners purportedly argue that their persecution was on account of their membership in the four aforementioned PSGs,

- 16 -

central reason" for the harm they suffered.  "Whether a protected ground is one central reason for an asylum-seeker's persecution is ordinarily a question of fact," which we review under our substantial evidence standard.[10]  Jimenez-Portillo, 56 F.4th at 167.

A few words on the substantial evidence standard.  Put simply, it's no walk in the park because, "[t]o reverse under the substantial evidence standard," "the evidence must not only support the contrary finding, but compel it."  Caz, 84 F.4th at 28 (quoting Mahmoud v. Barr, 981 F.3d 122, 126 (1st Cir. 2020)).  As such, it is insufficient for the record to support a contrary conclusion to that drawn by the agency.  Jimenez-Portillo, 56 F.4th at 167.  Rather, the record must point decidedly "in the opposite direction."  Caz, 84 F.4th at 28 (quoting López-Pérez v. Garland,

---

the substance of their argumentation addresses only the "Penafiel[-]Peralta Nuclear Family" PSG.  Without any actual developed argumentation regarding nexus to the other three PSGs, we deem those claims waived, see Martínez-Pérez, 897 F.3d at 40 n.5, and address only Petitioners' family-based PSG.

[10] Time for a brief aside on nexus and substantial evidence. We've previously recognized that there's "tension inherent in applying the substantial evidence standard, a mode of review 'reserved for factual findings,'" to "the agency's nexus conclusion" because that conclusion "involves factual determinations by the IJ but a de novo review by the BIA as to whether those facts taken together are sufficient to meet the legal standard."  Ferreira, 97 F.4th at 46 n.4 (quoting Aguilar-Escoto v. Garland, 59 F.4th 510, 519-20 (1st Cir. 2023)).  But, as in Ferreira, neither party highlights that tension or asks us to resolve it, so we'll leave that for another day.  Id.

26 F.4th 104, 111 (1st Cir. 2022)). Under this lens of review, therefore, Petitioners have the burden of demonstrating that the record compels the conclusion that their family membership was at least one central reason for their persecution.

In Petitioners' view, the record does just that. While they readily (and repeatedly) admit that Sandra and Borroso targeted them because of a personal land-related dispute, they contend that their family membership was "at least one central reason" for their persecution because it cannot be "disentangled" from the non-statutorily-protected motivation (i.e., the land dispute). Because their family owned and bought the land, they built a house on it and the El Triunfo community recognized them as the owners of the land, Petitioners argue, Sandra and Borroso necessarily targeted them also because of their family membership.

These arguments, unfortunately for Petitioners, don't get them very far. To explain, we've recognized "that the mere fact that a family received threats as a family unit, without more, does not convert a non-protected criminal motivation into persecution on the basis of family connections." Pineda-Maldonado, 91 F.4th at 85 (cleaned up) (quoting Barnica-Lopez, 59 F.4th at 531-32). As such, for family membership to serve as the required statutorily protected ground, it "must be at the root of the persecution, so that family membership itself brings about the persecutorial conduct." Ruiz v. Mukasey, 526

- 18 -

F.3d 31, 38 (1st Cir. 2008). That analysis requires consideration as to "whether it is possible to disentangle the applicant's family status from the persecutor's other motives, or if they are two sides of the same coin." Ferreira, 97 F.4th at 47 (quoting Pineda-Maldonado, 91 F.4th at 88-89) (internal quotation marks omitted).

Applying that mode of analysis here, we conclude that it is possible to disentangle Petitioners' family membership from the land dispute, such that the record doesn't compel the conclusion that family membership was one central reason for Petitioners' persecution. Look first to Petitioners' acquisition of the land. They bought the land from Sandra; they did not inherit it through their familial connection and there's nothing in the record to suggest Sandra would not have sold them the land had they been mere acquaintances or friends from the broader El Triunfo community. Cf. id. at 49 ("[T]here is record support for the IJ's finding that the uncle targeted Ferreira because she was present in his home, regardless of their relationship."). Look next to the timing and content of the threats. The threats began when Borroso expressed interest in buying the land from Sandra for more money than Petitioners had paid and ended when Petitioners moved to Penafiel-Peralta's mother's home. See Ramos-Gutierrez v. Garland, No. 23-1885, 2024 WL 3451570, at *4 (1st Cir. July 18, 2024) ("[T]he petitioner testified that the harassment began after

the petitioner refused to join the gang."). The threats themselves all centered, as Petitioners acknowledged in their sworn, written statements, on "exil[ing]" them and getting them off the land.

Significantly, there's also nothing in the record to suggest that either Sandra or Borroso would have treated Petitioners any better (or any worse) had they been members of another family who had bought the land and refused to leave. To the contrary, the record supportably shows that Sandra was motivated by her desire for more money for her land (regardless of whom she previously might have sold the land to) and Borroso was motivated by his desire to have his newly bought land tenant-free (regardless of whom those tenants were or which family they belonged to). In this way, then, Petitioners' family membership was simply "incidental" and -- as the BIA noted -- "tangential."[11] Barnica-Lopez, 59 F.4th at 528 (quoting Sánchez-Vásquez, 994 F.3d at 47).

---

[11] For these same reasons, Petitioners' invocation of our decision in Pineda-Maldonado does little to help their cause. There, a group of cattle thieves targeted the petitioner because the petitioner's father owed the cattle thieves a gambling debt. Pineda-Maldonado, 91 F.4th at 79. We reversed the agency's nexus determination because, although the cattle thieves targeted the petitioner out of a pecuniary motive to have him pay off his father's debt, the only reason they viewed the petitioner as indebted to them was petitioner's familial connection to his father. Id. at 86-87. We, therefore, concluded it was impossible to "disentangle" the statutorily protected motive from the non-statutorily-protected motive. Id. at 89. As explained at length above, though, no such entanglement exists here.

In sum, the agency determined that there was no nexus between Petitioners' family membership and the persecution they suffered -- a determination which is supported by substantial evidence. Consequently, the denial of asylum was proper.

*Withholding of Removal*

The demise of Petitioners' asylum claim necessarily requires the same result for Penafiel-Peralta's withholding of removal claim. That is so because withholding of removal, like asylum, requires a showing of persecution, including the nexus requirement. Lopez de Hincapie v. Gonzales, 494 F.3d 213, 220 (1st Cir. 2007). Withholding of removal, however, has a higher standard of proof, so a failure to satisfy the asylum standard also means a failure to satisfy the withholding standard. Cabrera, 100 F.4th at 324. All in all, then, the agency committed no error in denying withholding of removal.

**WHAT THIS ALL MEANS**

To recap, with no nexus to a statutorily protected ground, we must deny the petition.