**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-1331**

MAYDAI HERNANDEZ-AVALOS,

> Petitioner,

v.

LORETTA E. LYNCH, Attorney General,

> Respondent.

On Petition for Review of an Order of the Board of Immigration
Appeals.

Argued: March 25, 2015                     Decided: April 30, 2015

Before SHEDD, WYNN, and THACKER, Circuit Judges.

Petition for review granted; remanded for further proceedings by
published opinion. Judge Shedd wrote the opinion, in which
Judge Wynn and Judge Thacker joined.

**ARGUED:** Tamara L. Jezic, YACUB LAW OFFICES, LLC, Woodbridge,
Virginia, for Petitioner. Rebecca Hoffberg Phillips, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.
**ON BRIEF:** Ivan Yacub, YACUB LAW OFFICES, LLC, Woodbridge,
Virginia, for Petitioner. Joyce R. Branda, Acting Assistant
Attorney General, Civil Division, Daniel E. Goldman, Senior
Litigation Counsel, Samuel P. Go, Senior Litigation Counsel,
Office of Immigration Litigation, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., for Respondent.

SHEDD, Circuit Judge:

Maydai Hernandez-Avalos, a native and citizen of El Salvador, petitions for review of a final order of removal entered by the Board of Immigration Appeals (BIA). For the reasons that follow, we grant Hernandez's petition for review, vacate the BIA's order, and remand for further proceedings.

I.

In June 2008, Hernandez and her son, Kevin Avalos-Rojas, entered the United States near Eagle Pass, Texas, without inspection and without valid entry documents. The following month, the Government initiated deportation proceedings against them.[1] Hernandez admitted the factual allegations in her Notice to Appear and conceded her removability, but sought relief from removal in the form of asylum and withholding of removal under the Immigration and Naturalization Act (INA).[2] She had a hearing before an Immigration Judge (IJ) in February 2012, during which

---

[1] Under 8 U.S.C. § 1158(b)(3), Kevin Avalos-Rojas is a derivative beneficiary in his mother's application for asylum and may also be granted asylum if his mother's application is approved. The parties to this appeal therefore focus exclusively on Hernandez's claims.

[2] Hernandez also sought relief under the Convention Against Torture (CAT), but because she did not appeal the IJ's denial of her CAT claims to the BIA, these claims are now deemed waived. See 8 U.S.C. § 1252(d)(1); Cordova v. Holder, 759 F.3d 332, 336 n.2 (4th Cir. 2014).

she related certain threats she had received in El Salvador from members of the gang Mara 18.[3]  The IJ, considering both her live and written testimony, found her to be a "generally credible witness," A.R. 47, and her testimony is summarized below.

In 2007, members of the gang Mara 18 killed Augustin, the cousin of Hernandez's husband, because he refused to join their ranks.  Hernandez did not herself witness Augustin's murder, but she later identified his body at the medical forensic lab in her town and took it home to prepare it for burial.  Following Augustin's burial, heavily armed gang members came to her house and threatened to kill her if she identified the gang members to the authorities as the men responsible for Augustin's murder.

Although the exact date is unclear from the record, within a few months Hernandez was threatened with death a second time. Five Mara 18 members came to her home and told her that because her son Kevin was getting older, "he was getting ready to join the maras." A.R. 115.  Kevin was twelve years old at the time. When Hernandez responded that her son was not going to join the gang, the gang members put a gun to her head and told her that if she opposed her son's joining them, "[she] was the one who

_____

[3] Mara 18 is a "particularly violent and aggressive gang" which "operate[s] openly in El Salvador." Orellana-Monson v. Holder, 685 F.3d 511, 515 (5th Cir. 2012).  The gangs in El Salvador "encourage juvenile criminal activity, and they train new members in crimes such as drug dealing and murder." Id.

was going to die." A.R. 116. One of the men who threatened her on this occasion was later prosecuted and sentenced to 25 years in prison by the Salvadoran government for killings unrelated to any interaction between Mara 18 and Hernandez's family. Hernandez was not involved in that prosecution, and we have no further information about these killings.

In May 2008, Mara 18 members threatened to kill Hernandez for the third time. They came to her home, put a gun to her head, and told her that her son was ready to join the gang. She responded that her son was not going to join and that she was not going to allow the gang members to get any closer to him. The Mara 18 members then aimed the gun at her and told her that they were going to force her son to join. When Hernandez responded that she did not want her son to be like them, but instead wanted him to study and to be a good person, the Mara 18 members told her that she had one day to turn her son over to the gang or she would be killed.

Before dawn the following day, Hernandez and her son left El Salvador for the United States with the help of a smuggler. Hernandez stated that reporting these incidents to the Salvadoran police was not an option for her because "[t]he police routinely arrested gang members and within days they were released. Many times the gang members learned who reported them to the police and retaliated against that person. I was afraid

4

that would happen to me." A.R. at 147-48. Hernandez also stated that she does not believe that she can go back to El Salvador because the gangs would kill her.

Despite finding her testimony credible, the IJ found that Hernandez had not established her eligibility for asylum because she had not demonstrated that she was likely to suffer future persecution on account of a protected ground, nor had she demonstrated that she was threatened by persons that the Salvadoran government was unwilling or unable to control. The IJ therefore denied her petition for relief and ordered her removed to El Salvador. Hernandez appealed to the BIA, which affirmed the IJ's decision. She timely filed a petition for review of the BIA's decision in this court, challenging the BIA's denial of her claim for eligibility for asylum and its failure to consider her request for withholding of removal.

II.

The INA permits the Secretary of Homeland Security or the Attorney General, in their discretion, to grant asylum to any alien who qualifies as a refugee. 8 U.S.C. § 1158(b)(1)(A). See also I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 443 (1987); Naizgi v. Gonzales, 455 F.3d 484, 486 (4th Cir. 2006). To qualify as a refugee, and thereby to establish eligibility for asylum, an alien must demonstrate that she

5

is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, [her native] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A).[4]

Where the BIA adopts the IJ's opinion and supplements it with its own reasoning, we review both rulings. Barahona v. Holder, 691 F.3d 349, 353 (4th Cir. 2012). But where, as here, the BIA issues its own opinion without adopting the IJ's reasoning, we review only the BIA's final order. Martinez v. Holder, 740 F.3d 902, 908 (4th Cir. 2014). We review factual findings under the substantial evidence standard, meaning that they are conclusive "unless any reasonable adjudicator would be compelled to conclude to the contrary," Cordova v. Holder, 759 F.3d 332, 337 (4th Cir. 2014) (quoting 8 U.S.C. § 1252(b)(4)(B)), and we review legal determinations de novo,

---

[4] Withholding of removal, by contrast, is a form of mandatory relief. To qualify, "the applicant must establish that if she is removed, there is a clear probability that her 'life or freedom would be threatened ... because of [her] race, religion, nationality, membership in a particular social group, or political opinion.'" Marynenka v. Holder, 592 F.3d 594, 600 (4th Cir. 2010) (quoting 8 U.S.C. § 1231(b)(3)(A)) (emphasis added). "[A]n applicant who fails to meet the lower standard for showing eligibility for asylum will be unable to satisfy the higher standard for showing withholding of removal." Mirisawo v. Holder, 599 F.3d 391, 396 (4th Cir. 2010). Because the BIA found that Hernandez was not eligible for asylum, it did not consider her withholding of removal claim in this case.

Marynenka v. Holder, 592 F.3d 594, 600 (4th Cir. 2010).[5] Finally, we must uphold the BIA's decision "unless it is 'manifestly contrary to law and an abuse of discretion.'" Cordova, 759 F.3d at 337 (quoting Tassi v. Holder, 660 F.3d 710, 719 (4th Cir. 2011)).

## III.

Under 8 U.S.C. § 1101(a)(42)(A), to establish her eligibility for asylum, Hernandez must prove that she (1) has a well-founded fear of persecution; (2) on account of a protected ground; (3) by an organization that the Salvadoran government is unable or unwilling to control. Lopez-Soto v. Ashcroft, 383 F.3d 228, 234 (4th Cir. 2004) (vacated pending reh'g en banc on other grounds).

## A.

As to the first requirement, we have expressly held that "the threat of death qualifies as persecution." Crespin-Valladares v. Holder, 632 F.3d 117, 126 (4th Cir. 2011) (citing Li v. Gonzales, 405 F.3d 171, 177 (4th Cir. 2005)). Further, "[a]pplicants who demonstrate past persecution are presumed to have a well-founded fear of future persecution." Naizgi, 455

---

[5] Because the BIA's opinion in this case was issued by a single member, it is non-precedential and not entitled to Chevron deference. Cordova, 759 F.3d at 337 n.3.

7

F.3d at 486 (citing 8 C.F.R. § 1208.13(b)(1)). Because Hernandez credibly testified that she received death threats from Mara 18, she has proven that she has a well-founded fear of future persecution were she to return to El Salvador.[6] She has thus satisfied the first prong of eligibility for asylum.

                                B.

Next, Hernandez must show that the persecution she suffered was on account of a protected ground. "Persecution occurs 'on account of' a protected ground if that ground serves as 'at least one central reason for' the feared persecution." Crespin-Valladares, 632 F.3d at 127 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). Among the protected grounds listed in the asylum statute is "membership in a particular social group." 8 U.S.C. § 1158(b)(1)(B)(i). Hernandez claims, and the government correctly acknowledges, that membership in a nuclear family qualifies as a protected ground for asylum purposes. See Crespin-Valladares, 632 F.3d at 125 ("[T]he family provides a prototypical example of a particular social group.") (internal quotation marks and citations omitted).

---

[6] The government conceded at oral argument that to the extent the IJ found, and the BIA affirmed, that Hernandez had not established a well-founded fear of future persecution, this was error.

8

The government argues, however, that the BIA was correct in holding that Hernandez's persecution was not "on account of" her family ties. To prove that persecution took place on account of family ties, an asylum applicant "need not show that his family ties provide 'the central reason or even a dominant central reason' for his persecution, [but] he must demonstrate that these ties are more than 'an incidental, tangential, superficial, or subordinate reason' for his persecution." Id. at 127 (quoting Quinteros-Mendoza v. Holder, 556 F.3d 159, 164 (4th Cir. 2009)) (emphasis in original).

The BIA concluded that the threats to kill Hernandez unless she allowed her son to join the gang were not made on account of Hernandez's membership in her nuclear family. It reasoned that "[s]he was not threatened because of her relationship to her son (i.e. family), but rather because she would not consent to her son engaging in a criminal activity." A.R. 4. The government argues that the BIA did not err in concluding that gang recruitment was the central motivation for these threats. Further, it argues that the fact that the person blocking the gang members' recruitment effort was their membership target's mother was merely incidental to the recruitment aim.

We believe that this is an excessively narrow reading of the requirement that persecution be undertaken "on account of membership in a nuclear family." Hernandez's relationship to

her son is why she, and not another person, was threatened with death if she did not allow him to join Mara 18, and the gang members' demands leveraged her maternal authority to control her son's activities. The BIA's conclusion that these threats were directed at her not because she is his mother but because she exercises control over her son's activities draws a meaningless distinction under these facts. It is therefore unreasonable to assert that the fact that Hernandez is her son's mother is not at least one central reason for her persecution.

Indeed, we recently rejected a similar government argument in Cordova v. Holder, 759 F.3d 332 (4th Cir. 2014), a case that also dealt with a Salvadoran citizen who was the target of gang violence. There, MS-13 gang members repeatedly threatened and attacked petitioner Aquino, at first with the stated goal of inducing him to join the gang, and later because they believed his cousin and uncle were members of a rival gang. Id. at 334-35. The BIA held that Aquino's kinship ties to his cousin and uncle were not a central reason for the gang's threats, reasoning that Aquino had not shown that MS-13 had uniquely targeted his family and that MS-13 had first targeted Aquino as an incident of recruitment. Id. at 339. We found this reasoning insufficient because the BIA had not properly considered Aquino's evidence that the later threats he received were motivated by retaliation for his cousin and uncle's

10

membership in a rival gang.  Id.  We therefore concluded that the recruitment motivation underlying Aquino's persecution did not preclude the existence of another central reason – family ties – for that same persecution.

Similarly, in this case, Mara 18 threatened Hernandez in order to recruit her son into their ranks, but they also threatened Hernandez, rather than another person, because of her family connection to her son.  Thus, under Cordova, the government's argument that recruitment was Mara 18's primary motivation is unavailing, because there were multiple central reasons for the threats Hernandez received.[7]

Because any reasonable adjudicator would be compelled to conclude that Hernandez's maternal relationship to her son is at least one central reason for two of the threats she received, we hold that the BIA's conclusion that these threats were not made "on account of" her membership in her nuclear family is manifestly contrary to law and an abuse of discretion.

---

[7] This is not to say that every threat that references a family member is made on account of family ties.  It may well be that the threat directing Hernandez not to identify the murderers of her husband's cousin was not made on account of Hernandez's familial connections.  That same threat could have been directed at any person who knew about the gang members' criminal activities.  By contrast, the two threats that directed Hernandez to turn her son over to the gang were meaningful only because of her maternal authority over her son's actions, and there is no evidence that she would have been selected as the recipient of those threats absent that familial connection.

Accordingly, Hernandez has met the second asylum eligibility requirement.

C.

Finally, Hernandez must show that the Salvadoran government is either unwilling or unable to control the gang members who threatened her. The BIA found that Hernandez had "not shown any clear error in the Immigration Judge's factual finding" that the government of El Salvador would not be unwilling or unable to protect her from the gang. A.R. 4. As a result, we must also examine the IJ's factual finding on this issue.

The IJ acknowledged that the gang problem in El Salvador is "quite serious" and that Hernandez had perhaps failed to report the threats she received to the Salvadoran authorities because the Mara 18 members had threatened to harm her if she did so. A.R. 50. Despite these observations, however, the IJ concluded that Hernandez had not shown that El Salvador is unwilling or unable to protect her because she had not attempted to obtain protection from the Salvadoran authorities. Id. In support of this rationale, the IJ stated that Hernandez had testified that one of the gang members responsible for Augustin's murder had been imprisoned and sentenced to 25 years. Id. Moreover, the IJ stated that the government of El Salvador, "with significant support from the United States Government, has taken a variety of law enforcement and social measures to address gang

12

criminality." Id. The BIA found no clear error in this determination and added only its reiteration that "the respondent testified that one of the gang members responsible for Augustin's murder was arrested, convicted and imprisoned. He was sentenced to 25 years." A.R. 4.

There are several errors in the BIA's conclusion that Hernandez has not shown that El Salvador is unwilling or unable to protect her. The IJ and the BIA misstated Hernandez's testimony and drew unjustified conclusions from it. Next, the BIA failed to consider relevant evidence of country conditions in El Salvador. Finally, the IJ relied on his unsupported personal knowledge of conditions in El Salvador.

### 1.

"'Whether a government is "unable or unwilling to control" private actors ... is a factual question that must be resolved based on the record in each case.'" Crespin-Valladares, 632 F.3d at 128 (quoting Menjivar v. Gonzales, 416 F.3d 918, 921 (8th Cir. 2005)). Despite the "extremely deferential standard" under which we review an IJ's factual findings, Menghesha v. Gonzales, 450 F.3d 142, 147 (4th Cir. 2006), an IJ is not entitled to ignore an asylum applicant's testimony in making those factual findings. See Cordova, 759 F.3d at 340 ("[U]ltimately, in reviewing agency decisions in immigration matters, it is our responsibility to ensure that unrebutted,

13

legally significant evidence is not arbitrarily ignored by the fact finder.") (internal citations and quotation marks omitted); see also Tassi, 660 F.3d at 719 ("[A]n IJ is not entitled to base a decision on only isolated snippets of the record while disregarding the rest.") (internal citations and quotation marks omitted). The BIA abuses its discretion if it "fail[s] to offer a reasoned explanation for its decision, or if it distort[s] or disregard[s] important aspects of the applicant's claim." Id.

The IJ's claim that Hernandez testified that one of the gang members responsible for Augustin's murder was convicted and imprisoned is factually incorrect. Hernandez testified not that this gang member was one of the men who had killed Augustin, but rather, that he was one of the men who made the first death threat against Hernandez. See A.R. 116. That the BIA failed to correct the IJ's factual error, and in fact repeated it in its own opinion, suggests that the BIA did not engage in a proper review of the facts.

Moreover, the BIA relied on its mistaken belief that El Salvador had imprisoned one of Augustin's murderers to suggest that the authorities would have been receptive to Hernandez's complaints if she had reported the death threats. This significantly distorts the implications of Hernandez's testimony. She did not testify that a gang member had been prosecuted and imprisoned for murdering her relative; rather,

14

she testified that a gang member who had threatened her was later prosecuted and imprisoned <u>for unrelated crimes</u>. A.R. 116. Hernandez testified that her family had not prompted the prosecution, and she did not provide any details about the "other crimes" and "other killings" for which he had been prosecuted or the circumstances of his imprisonment. <u>Id.</u> The BIA's factual mistake seems to have motivated its faulty conclusion that the Salvadoran government would have been willing to prosecute the gang members who threatened Hernandez because it had prosecuted gang members who had attacked her family in the past.[8] Under a correct reading of the record, however, there is no evidence of what motivated the police to prosecute and imprison that gang member. As a result, there is no evidence that the police in Hernandez's neighborhood would have been responsive if she had reported the death threats.

To the contrary, Hernandez, whom the IJ found to be a credible witness, provided abundant evidence that the authorities would not have been responsive to such a report. Hernandez's affidavit, in combination with the other evidence presented in this case, suggests that the police in her

---

[8] To the extent the IJ suggested that the gang member's imprisonment for unrelated killings in any way supports the inference that the Salvadoran authorities would have been responsive to <u>Hernandez's</u> complaints, that conclusion is unwarranted.

neighborhood may be subject to gang influence. <u>See</u> A.R. 147-48 ("Reporting these incidents to the police was not an option for me. The police routinely arrested gang members and within days they were released. Many times the gang members learned who reported them to the police and retaliated against that person. I was afraid that would happen to me."). Further, even if the authorities in her neighborhood were willing to protect her against the gangs, Hernandez testified that they would be unable to do so. <u>See</u> A.R. 146-47 ("Of course, I was fearful and knew the authorities could not provide me with any degree of protection. For that reason, I did not turn them in."). Thus, the BIA relied on a misstatement of the record, misinterpreted its significance, and ignored Hernandez's contrary credible testimony in reaching its finding.

2.

That the BIA accepted the IJ's decision to disregard Hernandez's testimony is even more surprising because her testimony is completely consistent with the 2011 State Department Human Rights Report for El Salvador.[9] This report

---

[9] The BIA was certainly aware of this Report because Hernandez cited it in her brief before the BIA. Moreover, the BIA may take administrative notice of the contents of official documents, which include reports such as this one, in the course of deciding appeals. 8 C.F.R. § 1003.1(d)(3)(iv). "A State Department report on country conditions is highly probative (Continued)

16

notes the existence of widespread gang influence and corruption within the Salvadoran prisons and judicial system, and, considered in conjunction with Hernandez's testimony regarding conditions in her neighborhood, negates the IJ's finding that the Salvadoran government is not unwilling or unable to protect Hernandez from the Mara 18 members who threatened her.

3.

Finally, the IJ's reliance on his own, unsubstantiated knowledge of conditions in El Salvador to conclude that the government was not unwilling or unable to protect her was error. If the IJ relies on his own knowledge of country conditions as a basis for a finding, the IJ must support that knowledge with evidence in the record. See Tassi, 660 F.3d at 719 ("Nor may the IJ ... 'rely on speculation, conjecture, or an otherwise

---

evidence in a well-founded fear case." Gonahasa v. INS, 181 F.3d 538, 542 (4th Cir. 1999).

The Report states that "[t]he principal human rights problems [in El Salvador] were widespread corruption, particularly in the judicial system," that "gangs continued to exercise influence within the prisons and judicial system," that "gang intimidation and violence against witnesses contributed to a climate of impunity from criminal prosecution," and that "[t]he law provides criminal penalties for official corruption; however, the government did not implement the law effectively, and officials, particularly in the judicial system, engaged in corrupt practices with impunity". United States Dep't of State, Country Reports on Human Rights Practices for 2011: El Salvador, available at http://www.state.gov/j/drl/rls/hrrpt/humanrights report/index.htm?dlid=186513, at 1, 4, 7, and 12 [hereinafter State Department Report](saved as ECF opinion attachment).

17

unsupported personal opinion to discredit an applicant's testimony or her corroborating evidence.'") (quoting Jian Tao Lin v. Holder, 611 F.3d 228, 237 (4th Cir. 2010)). Indeed, as the BIA itself has explained, "[w]e recognize that over time, Immigration Judges will accumulate significant knowledge from their experience involving the conditions in numerous countries. However, any evidence relied upon by the Immigration Judge must be included in the record so that the Board can meaningfully review any challenge to the Immigration Judge's decision on appeal." In re S-M-J-, 21 I. & N. Dec. 722, Interim Decision 3303 (BIA 1997). The IJ's reliance on his unsupported personal knowledge of conditions in El Salvador to discredit Hernandez's testimony was thus error.

In sum, Hernandez's credible testimony, which is corroborated by the State Department Report, is legally sufficient under the circumstances present here to establish that the Salvadoran authorities are unable or unwilling to protect her from the gang members who threatened her. The evidence on which the IJ relied to overcome the strength of that testimony is inadequate, because the IJ was not entitled to rely on his unsupported knowledge of country conditions, and because the IJ distorted the significance of the arrest and imprisonment of one gang member. We therefore find that the BIA erred in affirming the IJ's ruling that Hernandez had not satisfied this

third prong of eligibility for asylum. Further, because the only evidence relied on by the IJ and the BIA to discredit Hernandez's testimony is legally deficient, Hernandez's evidence of police ineffectiveness and corruption remains unrefuted and compels the conclusion in this case that as a matter of law, she has met her burden of showing that the authorities are unwilling and unable to protect her against the threats she received.[10] Therefore, Hernandez has established her eligibility for asylum.

---

[10] At oral argument, the government conceded that this Court is entitled to draw its own legal conclusions from the undisputed facts in the record that was created by the Board of Immigration Appeals and which is now before us. Although we are not empowered to consider factual issues in asylum application cases in the first instance, see Hussain v. Gonzales, 477 F.3d 153, 157 (4th Cir. 2007) (citing INS v. Ventura, 537 U.S. 12, 16-18 (2002), and Gonzales v. Thomas, 547 U.S. 183, 186-87 (2006)), that is not the situation in this case. Here, we review the BIA's factual determination on the third prong, which it made after due consideration, and we hold that, as a matter of law, the opposite conclusion is compelled. Cf., e.g., Crespin-Valladares, 632 F.3d at 126 (reversing BIA's determination that Crespin had not proven his well-founded fear of persecution and finding instead that, based on the record, "Crespin made that showing here.").

19

IV.

For the foregoing reasons, we grant Hernandez's petition for review and remand the case to the BIA for further proceedings consistent with this opinion.[11]

PETITION FOR REVIEW GRANTED;
REMANDED FOR FURTHER PROCEEDINGS

---

[11] In light of Hernandez's eligibility for asylum, on remand the BIA should consider her withholding of removal claim.