# United States Court of Appeals
## For the First Circuit

No. 23-1890

FIDEL ANGEL LOPEZ-QUINTEROS; EVELYN DE LOS ANGELES
POLANCO-ORTIZ; A.A.L.P.,

Petitioners,

v.

MERRICK B. GARLAND,

Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Barron, Chief Judge,
Selya and Kayatta, Circuit Judges.

Kristian R. Meyer, with whom Kevin P. MacMurray and MacMurray & Associates were on brief, for petitioners.

Kristen H. Blosser, Trial Attorney, Office of Immigration Litigation, with whom Brian Boynton, Principal Deputy Assistant Attorney General, Civil Division, and Anthony P. Nicastro, Assistant Director, Office of Immigration Litigation, were on brief, for respondent.

December 13, 2024

**BARRON**, **Chief Judge**.  Fidel Angel Lopez Quinteros ("Lopez"), Evelyn de Los Angeles Polanco Ortiz ("Polanco"), and A.A.L.P. are natives and citizens of El Salvador.  They petition for review of the decision by the Board of Immigration Appeals ("BIA") that denied their respective claims for asylum.  We deny the petition in part, grant it in part, and remand for further proceedings consistent with this opinion.

## I.

In 2021, the U.S. Department of Homeland Security issued Notices to Appear to the petitioners charging them as subject to removal for being present in the United States without having been admitted or paroled.  The petitioners admitted to the factual allegations in the Notices to Appear and conceded that they were removable as charged.

Lopez and Polanco then filed applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  A.A.L.P., being a minor, was listed as a derivative beneficiary in connection with Lopez's application for asylum, withholding of removal, and protection under the CAT.

The petition for review challenges only the agency's denial of the applications for asylum.  To be eligible for asylum, see 8 U.S.C. § 1158(b)(1)(A), applicants must show that they are "unable or unwilling to avail [themselves] of the protection of" any country of their nationality "because of persecution or a

well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," id. § 1101(a)(42)(A).  A "particular social group" is a "group of persons sharing a common, immutable characteristic that makes the group socially visible and sufficiently particular." Mendez-Barrera v. Holder, 602 F.3d 21, 25 (1st Cir. 2010).

Asylum is "proper in mixed-motive cases even where one motive [for the mistreatment that grounds the alleged persecution] would not be the basis for asylum, so long as one of the statutory protected grounds is 'at least one central reason' for the persecution."  Aldana-Ramos v. Holder, 757 F.3d 9, 18 (1st Cir. 2014) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)).  Moreover, the alleged persecution not only must be causally connected to a statutorily enumerated ground but also must be "the direct result of government action, government-supported action, or government's unwillingness or inability to control private conduct."  Nikijuluw v. Gonzales, 427 F.3d 115, 121 (1st Cir. 2005).

A showing of past persecution "creates a rebuttable presumption of a well-founded fear of future persecution." Paiz-Morales v. Lynch, 795 F.3d 238, 243 (1st Cir. 2015) (quoting Singh v. Holder, 750 F.3d 84, 86 (1st Cir. 2014)).  We have held that "credible death threats" can "amount to past persecution." Aguilar-Escoto v. Garland, 59 F.4th 510, 516 (1st Cir. 2023); see Javed v. Holder, 715 F.3d 391, 395-96 (1st Cir. 2013).

- 4 -

On November 28, 2022, the petitioners attended a merits hearing before the Immigration Judge ("IJ") in which Lopez and Polanco testified. According to their testimony and written declarations, Lopez and Polanco at all relevant times were intimate partners, often referred to each other as "husband" and "wife," and share one child together -- A.A.L.P. -- who was born in El Salvador on April 13, 2021. Lopez and Polanco also testified about why they had fled El Salvador for the United States and why they feared going back. They testified that members of a gang had threatened them with death on account of their membership in particular social groups -- namely, as relevant for our purposes, the particular social group of "business owners" in the case of Lopez, and Lopez's family in the case of Polanco. In advancing those grounds for asylum, Lopez and Polanco each testified to having been subjected to past persecution on those bases in consequence of the death threats that the gang members had made against them.

The IJ found that both Lopez and Polanco had testified credibly. Nonetheless, the IJ denied their applications for asylum, withholding of removal, and protection under the CAT. Lopez and Polanco, along with A.A.L.P., appealed the IJ's decision, and on September 26, 2023, the BIA affirmed the IJ's holdings on asylum and withholding of removal and deemed the CAT claims waived because they were "not meaningfully challenged."

In affirming the IJ's ruling on the asylum claims, the BIA relied solely on the determination that the petitioners had failed to show a nexus between the alleged persecution and the applicants' memberships in those particular social groups, such that the persecution was "on account of" those memberships. See Sosa-Perez v. Sessions, 884 F.3d 74, 76-77 (1st Cir. 2018). In that regard, the BIA stated:

> As the [IJ]'s nexus determination is dispositive of the applications for asylum . . . under the [Immigration and Nationality Act ("INA")], we need not address other aspects of those claims, including whether the respondents have established past persecution, a well-founded fear of future persecution or cognizable social groups under the INA. See Matter of Hernandez-Romero, 28 I&N Dec. 374, 378-79 (BIA 2021) (declining to reach alternative issues on appeal regarding ineligibility for relief where an applicant is otherwise statutorily ineligible for such relief).

The three petitioners then filed this timely petition for review, which concerns only the claims for asylum.

**II.**

"Where, as here, the BIA 'adopts and affirms the IJ's ruling' but nevertheless 'examines some of the IJ's conclusions,' we review both the BIA and IJ opinions as a unit," Gómez-Medina v. Barr, 975 F.3d 27, 31 (1st Cir. 2020) (quoting Perlera-Sola v. Holder, 699 F.3d 572, 576 (1st Cir. 2012)), and we refer to the IJ and BIA together as the "agency." In conducting our review, we

- 6 -

defer to the agency's factual determinations "as long as those determinations are supported by substantial evidence," but we review questions of law de novo. Ahmed v. Holder, 611 F.3d 90, 94 (1st Cir. 2010).

## III.

Together, the petitioners challenge the BIA's denial of the asylum applications on three grounds: (1) that the BIA erred in failing to remand to the IJ so that the IJ could correct the November 28, 2022, hearing transcript; (2) that the BIA erred by failing "to engage in a proper mixed motivation analysis" in affirming the IJ's finding of a lack of a nexus between the claimed persecution and the petitioners' membership in a particular social group; and (3) that, "by only reviewing the nexus determination under a clear error standard, the [BIA] failed to apply the proper standard of review for mixed questions of fact and law." In addition, Lopez[1] contends that, contrary to the BIA's ruling, the record compels a finding that his "status as a 'Business Owner' was at least one central reason that motivated [his persecution]." And, finally, Polanco contends that, also contrary to the BIA's ruling, the record compels the conclusion that her "familial relationship to [Lopez] was at least one[]central reason that

---

[1] Because A.A.L.P. is a derivative beneficiary of Lopez's application for asylum, we sometimes refer to them both as "Lopez." See Malonda v. Mukasey, 285 F. App'x 767, 768 n.1 (1st Cir. 2008).

motivated the death threats made against her." We address these contentions in turn.

## A.

We start with the petitioners' contention that a remand is required because the transcript contains several statements that are identified only as "indiscernible." This contention rests on BIA precedent that recognizes that "[a] complete and accurate transcript is . . . essential for the [BIA] to adjudicate an appeal that turns on witness testimony." Matter of Kagumbas, 28 I. & N. Dec. 400, 406 (BIA 2021).

The Attorney General points out, however, that the petitioners failed to raise the concern about the transcript to the BIA when they appealed the IJ's ruling. Because this challenge was not exhausted before the agency, we may not address it. See 8 U.S.C. § 1252(d)(1); Varela-Chavarria v. Garland, 86 F.4th 443, 449-50 (1st Cir. 2023) (declining to review an unexhausted procedural-due-process claim); Odei v. Garland, 71 F.4th 75, 78 n.1 (1st Cir. 2023) (declining to consider an unexhausted argument regarding membership in a particular social group); United States v. Palomar-Santiago, 593 U.S. 321, 326 (2021) ("When Congress uses 'mandatory language' in an administrative exhaustion provision, 'a court may not excuse a failure to exhaust.'" (quoting Ross v. Blake, 578 U.S. 632, 639 (2016))).

- 8 -

The petitioners do argue otherwise based on United States v. Olano, 507 U.S. 725 (1993). But that decision concerns only Rule 52 of the Federal Rules of Criminal Procedure and so has no relevance here.

**B.**

We also are not persuaded by the petitioners' contention that the agency erred as a matter of law because it failed "to engage in a proper mixed motivation analysis." It is true that for alleged mistreatment to be "on account of" membership in a particular social group, membership in the group need only be "a central reason" for the mistreatment. Sosa-Perez, 884 F.3d at 80 (emphasis added) (internal quotation marks omitted). And the petitioners do contend that the agency failed to consider the fact that "[m]ultiple motivations can exist [for an applicant's persecution,] and the presence of a non-protected motivation does not render an applicant ineligible for refugee status." The petitioners assert that, although they were "targeted by gang members for financial gain and [for the gang members] to expand their power[,] [the agency] failed to properly consider whether [their proposed social groups were] a central reason motivating [their] mistreatment."

Neither the IJ's decision finding no nexus nor the BIA's decision affirming that finding, however, gives any indication that the agency "spurned the possibility of mixed motives," Khalil

- 9 -

v. <u>Garland</u>, 97 F.4th 54, 64 (1st Cir. 2024), or "prematurely terminate[d] the analysis upon the finding of another motive," <u>Sompotan</u> v. <u>Mukasey</u>, 533 F.3d 63, 70 (1st Cir. 2008). There also is no indication in the record that the petitioners "posit[ed] a plausible alternative motive to the one found by the [agency]" that the agency refused to consider because it was not the sole motive for the mistreatment. <u>Enamorado-Rodriguez</u> v. <u>Barr</u>, 941 F.3d 589, 595 (1st Cir. 2019) (first alteration in original).

Rather, the record shows that the agency determined that the evidence was insufficient to establish any nexus between the proposed particular social groups and the alleged persecution. For example, in relation to Lopez's application, the IJ stated:

> Turning next to the issue of nexus, the gangs in this case were motivated by their desire to increase their criminal profits and extort people with money in the area. There is <u>insufficient evidence</u> that the Respondent was targeted because he was a business owner. He stated that the gang members did go to him and ask him for protection money. However, the Court finds in this case <u>he was not targeted because he owned a taxi business but because the gangs wanted to increase their criminal enterprise and profits</u> (emphasis added).

And, in relation to Polanco's application, the IJ stated:

> With respect to the particular social groups asserted by the female co-Respondent, all of the particular social groups she asserted are legal, cognizable and have been recognized either by the 1st Circuit or the BIA or the Attorney General. However, the Court finds in this case there is <u>insufficient evidence</u> that

- 10 -

she was threatened on account of those protected grounds (emphasis added).

## C.

We similarly see no merit to the petitioners' contention that "by only reviewing the nexus determination under a clear error standard, the [BIA] failed to apply the proper standard of review for mixed questions of fact and law." The BIA expressly recognized that the clear-error standard of review applied to the IJ's factual findings and that the de novo standard applied to "all other issues, including issues of law, discretion, and judgment." Moreover, the BIA applied the correct standard in ruling that the IJ did not clearly err in finding that the petitioners' alleged persecutors were motivated not by a protected ground but by their desire for financial gain and to expand the gang's power. See Jimenez-Portillo v. Garland, 56 F.4th 162, 167 (1st Cir. 2022) ("Whether a protected ground is one central reason for an asylum-seeker's persecution is ordinarily a question of fact . . . .").

## D.

That brings us to Lopez's contention that, contrary to the agency's holding, "the record compelled a finding of nexus" with respect to his being a "business owner." Because a finding of past persecution gives rise to a presumption of future persecution on that same basis, Lopez focuses on what the record

shows about his having been subjected to past persecution based on his status as a "business owner," as he contends that "business owners" constitute a particular social group.

Lopez does not dispute that he was "targeted by gang members for financial gain and to expand their power." He nonetheless contends that the record compels the conclusion -- despite the agency's contrary finding -- that his status as a "business owner" was still "a central reason motivating his persecution" (emphasis added).

Lopez points to the record evidence that he contends establishes that "[i]t was not until [he] began operating his taxi company that he was approached, extorted, and threatened with death by [gang] members." He also contends that the record evidence establishes that "the gang[']s[] own actions, in taking over [Lopez]'s successful business and driving him out, indicate they were motivated to do so because he owned the business." And, finally, Lopez points to the evidence in the record of country conditions in El Salvador, including evidence that the U.S. Department of State has noted that gangs in El Salvador "perpetrate[] acts of violence[] against the business community, and members of other vulnerable populations."

We have previously held that the determination of whether the nexus requirement has been satisfied is one of fact, which we review for substantial evidence. See Guerra-Marchorro v.

- 12 -

Holder, 760 F.3d 126, 129 (1st Cir. 2014).  As a result, we may disturb the agency's no-nexus finding on the ground that it is unsupported by substantial evidence "only if the record is such as to compel a reasonable factfinder to reach a contrary determination."  Jianli Chen v. Holder, 703 F.3d 17, 21 (1st Cir. 2012).

Lopez introduced no direct evidence "that the gang's threats had anything to do with" his "business owner" status.  Aguilar-De Guillen v. Sessions, 902 F.3d 28, 34 (1st Cir. 2018).  Instead, he argues that the record compels a finding of nexus based on either the generalized evidence of country conditions, the evidence that the gang targeted him only when he began a business and drove him out of that business, or the combination of the two.  That evidence, however, is not enough to compel a factual finding contrary to the one that the agency made.  See Ruiz-Esobar v. Sessions, 881 F.3d 252, 259 (1st Cir. 2018) ("[A]n alien's speculation or conjecture, unsupported by hard evidence, is insufficient to establish nexus."  (internal quotation marks omitted)).

**E.**

We now address Polanco's contention that we must vacate the agency's denial of her asylum application because the agency wrongly found that she failed to meet her burden to show that the gang's death threats against her were "on account of" her familial

- 13 -

tie to Lopez. She contends that the record instead compels the finding that there was a nexus between those threats and that familial tie, such that her alleged past persecution was on account of her membership in a particular social group -- namely, Lopez's family.

There is no question that a family unit constitutes a particular social group, as the agency recognized. See Gebremichael v. INS, 10 F.3d 28, 36 (1st Cir. 1993) ("There can, in fact, be no plainer example of a social group based on common, identifiable and immutable characteristics than that of the nuclear family."); Ravindran v. INS, 976 F.2d 754, 761 n.5 (1st Cir. 1992) ("[A] prototypical example of a 'particular social group' would consist of the immediate members of a certain family, the family being a focus of fundamental affiliational concerns and common interests for most people." (quoting Sanchez-Trujillo v. INS, 801 F.2d 1571, 1576 (9th Cir. 1986))). The Attorney General also does not dispute that Polanco (or A.A.L.P., for that matter) is a member of Lopez's family, and the BIA did not rule otherwise.[2]

_____

[2] We note that the IJ did state that Polanco "was not threatened because of her familial relationship to" Lopez for two reasons: first, because Lopez and Polanco "are not in a familial relationship because they are not married to one another," and second, because "even if they were considered to be a nuclear family," "the gang members did not threaten" Polanco's life because of her familial relationship to Lopez but rather "as a means to an end to collect money from" Lopez. But the BIA relied only on the second reason to affirm the decision of the IJ, stating that the IJ "found, without clear error, that [Lopez] and his family were

- 14 -

The Attorney General contends, however, that substantial evidence supports the agency's determination that Polanco's familial tie to Lopez was not "a central reason" for her past mistreatment by the gang.  We disagree.

**1.**

The record shows that gang members initially targeted only Lopez, demanding that he pay "rent" to continue operating his business and later threatening to harm him if he did not pay a lump sum of at least $13,000.  The record also shows, however, that when Lopez failed to make the lump-sum payment, the gang members directed threats at both Polanco and A.A.L.P.

Notably, both Lopez and Polanco testified -- credibly, the IJ found -- that if Lopez did not meet the gang's monetary demands, then the gang would kill Polanco and A.A.L.P.  Moreover, the record establishes that when the gang members made the threats in question, they expressly referred to Polanco's and A.A.L.P.'s familial ties to Lopez.

Indeed, undisputed record evidence establishes both that members of the gang often would text Lopez and threaten to kill Polanco and A.A.L.P. and that Polanco would read these texts as well.  Some of the texts stated, "[W]e already know where your

targeted by gang members for financial gain and to expand their power, rather than on account of a protected ground" (emphasis added).

- 15 -

family is, we already know where your wife and kids are, and if you don't do what we want you know what will happen."

Despite these aspects of the record, the agency determined that Polanco was not threatened "on account of" her familial relationship to Lopez. The agency determined that she was threatened only as a "means to an end to collect money from [Lopez]." For that reason, the agency found that Polanco had failed to meet her burden to show that family membership was "one central reason" for the alleged persecution in this case. Aldana-Ramos, 757 F.3d at 18 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)).

## 2.

"The mere fact that [a family] received threats as a family unit, without more, 'does not convert [a] non-protected criminal motivation into persecution on the basis of family connections.'" Barnica-Lopez v. Garland, 59 F.4th 520, 531-32 (1st Cir. 2023) (quoting Loja-Tene v. Barr, 975 F.3d 58, 62 (1st Cir. 2020)). The claimed protected ground of family membership "must [instead] be at the root of the persecution, so that family membership itself brings about the persecutorial conduct." Id. at 530 (quoting Ruiz-Escobar v. Sessions, 881 F.3d 252, 259 (1st Cir. 2018)). Thus, the claimed protected ground cannot be "incidental, tangential, superficial, or subordinate to another reason for [the] harm," such that the claimed protected ground cannot be said

- 16 -

to be a "central reason" for the persecution in its own right. Id. at 528 (quoting Sanchez-Vasquez v. Garland, 994 F.3d 40, 47 (1st Cir. 2021)).

At the same time, petitioners claiming asylum based on persecution on account of their family status need not prove that the persecutors targeted them solely because of their family status. See id. In Marín-Portillo v. Lynch, we acknowledged the possibility that "petitioners [could] claim persecution on account of family membership when they are targeted as retaliation for the actions of another family member," 834 F.3d 99, 102 n.4 (1st Cir. 2016) (emphasis added), even though in that circumstance the actions of the other family member (rather than merely the family status of the petitioners) precipitated the claimed persecution.

In doing so, we also acknowledged the concern that, "because victims of persecution on account of family membership are regularly -- and perhaps invariably -- targeted, whether for retribution or otherwise, because of the actions of another member of their family," disallowing every claim of persecution "on account of family membership when [the petitioner is] targeted as retaliation for the actions of another family member" would "effectively swallow[] the rule that family membership is a protected social group." Id. (last alteration in original).

In Marín-Portillo itself, we upheld the agency's finding of no family-based nexus even though the petitioner claimed

persecution on account of family status by an individual who had allegedly murdered the petitioner's father.  Id. at 100, 102.  In so ruling, we emphasized the actions the record showed that the petitioner himself had taken towards the alleged persecutor, which we explained had led the alleged persecutor to want vengeance against the petitioner and to fear that the petitioner would take revenge on him for his having murdered the petitioner's father.  See id. at 101-02.  In consequence of the petitioner having taken those actions, we concluded that the record did not compel the finding that the petitioner's familial tie to his murdered father -- rather than his own actions toward the alleged murderer-turned-persecutor -- were at the root of the alleged persecutor's claimed mistreatment of him.  See id.

We emphasized in Marín-Portillo that "[w]e d[id] not intend for [our] opinion [upholding a finding of no family-status-based nexus] to shed light on the question of whether petitioners may claim persecution on account of family membership when they are targeted as retaliation for the actions of another family member."  Id. at 102 n.4.  We then recently distinguished Marín-Portillo in shedding light on that very question by holding that a petitioner could make out a claim of persecution based on family status in consequence of what the record showed there about the alleged persecutors having mistreated the petitioner due to

the actions of another member of his family.  See Pineda-Maldonado v. Garland, 91 F.4th 76, 79, 84-85 (1st Cir. 2024).

In that case, cattle thieves had targeted the petitioner to pay off a gambling-related financial debt that his deceased father owed.  Id.  We noted that although "there was clearly a pecuniary motive for the mistreatment," "the cattle thieves were targeting Pineda-Maldonado because they deemed him to be indebted to them," and "there [was] nothing in the record that could explain why the cattle thieves deemed Pineda-Maldonado to be indebted to them apart from their knowledge that he was a member of his father's family."  Id. at 86.

Thus, although we determined that there plainly was a pecuniary motive for the alleged mistreatment of the petitioner by the cattle thieves, we still found that the record provided support for finding that the petitioner's familial tie to another family member was "a central reason" for the mistreatment.  Id. at 88 (internal quotation omitted).  Accordingly, we "conclud[ed] that substantial evidence d[id] not support the agency's finding that Pineda-Maldonado showed his family status only to have been 'incidental' to . . . the cattle thieves' desire to obtain money from him."  Id. at 89.

**3.**

From all that the record reveals, the alleged persecutors here similarly targeted Polanco (and A.A.L.P.) "solely

- 19 -

due to the 'actions of another family member' -- namely, those of [Lopez in not paying the gang's demanded extortion amount] -- and [her] familial tie to that family member." Id. at 87 (quoting Marín-Portillo, 834 F.3d at 102 n.4). And while there is no question on this record that those alleged persecutors -- the gang members -- were targeting Polanco because of their desire to obtain money from Lopez, and thus for a pecuniary reason, there also is no question that "a central reason" for the gang's decision to target Polanco was her tie to another family member. Id. at 88.

It was that family member's action in not paying off the gang that, given this record, alone explains the gang's choice to threaten Polanco in particular. The gang members themselves referred to Polanco's familial tie to Lopez in lodging the threats, so they plainly were aware of that tie. Their referencing of that tie in making the threats also accords with it having been more than an incidental reason the gang members chose to target Polanco specifically.

In addition, there is nothing in the record that explains why the gang members targeted Polanco to pressure Lopez to pay up apart from the gang members' understanding that she was a member of Lopez's family. For example, nothing in the record suggests the gang members chose to lodge death threats against Polanco because they thought that she had special access to the money that they sought. Thus, we cannot say on that basis that their

- 20 -

motivation to target her for mistreatment could be deemed to stem from some attribute of hers apart from her familial status as Lopez's partner. Cf. Villalta-Martinez v. Sessions, 882 F.3d 20, 23-25 (1st Cir. 2018). Nor is there any evidence of the gang members targeting some non-family member who was nonetheless close to Lopez.

To be sure, this case is not precisely like Pineda-Maldonado. The gang members did not indicate that they were threatening Polanco because they understood her (or, for that matter, her child A.A.L.P.), by virtue of her status as a member of Lopez's family, to be responsible for paying the money that the gang members sought from Lopez. The alleged persecutors in Pineda-Maldonado, by contrast, were holding the petitioner responsible for his father's debt because of his status as that man's son, and the father himself was deceased and so could not pay off the debt. See 91 F.4th at 86. In addition, as we have noted, all indications are that the gang members here would have stopped threatening Polanco and A.A.L.P. if Lopez had paid off the gang.

These features of this case fail in and of themselves, however, to show that Polanco and A.A.L.P.'s familial ties to Lopez were not "a central reason" for the gang members' threats to kill them. Id. at 88 (internal quotation omitted). Like in Pineda-Maldonado, there is no evidence here that others outside of

the family unit also were subjected to mistreatment by the alleged persecutors. Cf. Villalta-Martinez, 882 F.3d at 25 ("Villalta-Martinez testified that in addition to targeting her, the gang members were indiscriminately following and threatening all store employees, supporting the BIA's conclusion that the gang members were seeking money without regard for Villalta-Martinez's familial relation."); Toledo-Vasquez v. Garland, 27 F.4th 281, 288-89 (4th Cir. 2022) (finding no nexus for petitioner's family-status-based persecution claim in part because the alleged persecutor there not only persecuted petitioner and other family members but also persecuted nonfamily members). In addition, there is no evidence in the record that the gang members knew about other family members but chose not to threaten them. In fact, as we stated previously, the record shows that both Polanco and the child she had with Lopez, A.A.L.P., were threatened to put pressure on Lopez to pay. Cf. Orellana-Recinos v. Garland, 993 F.3d 851, 858 (10th Cir. 2021) ("[S]upportive of the IJ's finding that the gang's motive was not hostility toward the family unit is that the gang did not threaten Ms. Orellana-Recinos's daughter.").

In other words, we see no basis in the record for finding that the gang members were just "seeking money without regard for [Polanco]'s familial relation," Villalta-Martinez, 882 F.3d at 25, or just threatening anyone close to Lopez, including those outside of Lopez's family unit, as a means of pressuring him. Rather, the

- 22 -

record compels the conclusion that Polanco's relationship with Lopez was why she, and not a person outside the family, was targeted by the gang members.  See Pineda-Maldonado, 91 F.4th at 76.

The partial dissent does argue that Pineda-Maldonado is distinguishable.  It notes that this case involves extortion and that case involved what it refers to as a "blood debt," thereby demonstrating that the petitioner in Pineda-Maldonado was singled out by his alleged persecutors due to his familial tie to the person who originally owed the debt -- his deceased father.  But the conclusion that the alleged persecutors in Pineda-Maldonado deemed the petitioner the "debtor" because of his "blood" ties to his father rested on no more than the following facts in the undisputed record: that the alleged persecutors held the petitioner responsible for the debt while noting that the petitioner was the son of the man who first owed it, id. at 88, that the alleged persecutors spared no other family members, id. at 87, and that the petitioner took no action to independently trigger the alleged persecutors' ire or incur a legal obligation to pay that debt, id. at 86, 88.  Because those same principles apply in this case, we thus fail to see how Pineda-Maldonado is distinguishable.

At bottom, there is no principled basis that we can see for treating extortionate threats against family members as

categorically distinct from demands to family members to pay a family debt that they do not lawfully owe, such that the former must be presumed to be aimed at anyone close to the victim of the extortion while the latter must be presumed to be aimed solely at those with blood ties to the original debtor. In either case, therefore, the question of whether the alleged persecution is family-based ultimately must depend on the extent to which the record shows that the family status of the targeted person drove the decision to target that person as a means of obtaining money that the targeted person had no legal obligation to hand over.

Thus, as in Pineda-Maldonado, we must consider what the record shows about the salience of the targeted family member's familial ties to the alleged persecutors. Id. at 86-88. And here, as we have explained, that evidence shows that the alleged persecutors made a point of emphasizing the target's familial ties to the person they were extorting, much as the evidence in Pineda-Maldonado showed that the alleged persecutors attributed their actions to the debt of Pineda-Maldonado's father. Id. at 88. In addition, as in Pineda-Maldonado, nothing in the record shows the alleged persecutors targeted persons without familial ties or "chose not to target another family member." Id. at 87. Nor, as in Pineda-Maldonado, does anything in the record show that the targeted person had done anything to arouse the interest of the alleged persecutors apart from having shared a familial tie.

- 24 -

See id. at 88 (observing that "[n]othing in the record indicates . . . that Pineda-Maldonado had taken any actions or made any statements that could have led" his alleged persecutors to target him).  Thus, just as we saw no non-speculative basis for concluding that there was substantial evidence to show that the target's families ties were of only incidental significance in Pineda-Maldonado, we see no such basis here.  Id.

**4.**

This conclusion accords with the Seventh Circuit's decision in Gonzalez Ruano v. Barr, 922 F.3d 346 (7th Cir. 2019), and the Fourth Circuit's decision in Hernandez-Avalos v. Lynch, 784 F.3d 944 (4th Cir. 2015).  In Gonzalez Ruano, the court held that an asylum applicant had shown persecution "on account of" his family status where the "relationship to his wife was the reason he, and not someone else, was targeted" by a persecutor who wanted to "possess" the applicant's wife.  922 F.3d at 355-56.  The court explained that was so because there was no action by the applicant that could explain the targeting apart from his having the familial tie.  Id.

Hernandez-Avalos involved gang members who had allegedly threatened to kill a mother if she prevented her son from joining their gang.  784 F.3d at 947-48.  The mother sought asylum, arguing that she was persecuted and feared persecution on account of her membership in a nuclear family.  Id. at 949.  The Fourth Circuit,

focusing on the fact that "the gang members' demands leveraged her maternal authority to control her son's activities," held that the mother's relationship with her son was why she, and not another person, was targeted by the gang members. Id. at 950. There was, the court reasoned, "no evidence that [the mother] would have been selected as the recipient of those threats absent that familial connection." Id. at 950 n.7.

So, too, it is "impossible to disentangle" Polanco's family status from the gang's pecuniary motives. Pineda-Maldonado, 91 F.4th at 89 (quoting Perez-Sanchez v. U.S. Att'y Gen., 935 F.3d 1148, 1158 (11th Cir. 2019)). And that is because, from all that the record shows, "[a]bsent the familial relationship between [Polanco] and [Lopez], the [gang] would never have [threatened Polanco with death]." Id. at 88-89 (first alteration in original) (quoting Perez-Sanchez, 935 F.3d at 1158).[3]

---

[3] We recognize that Perez-Sanchez, 935 F.3d 1148 (11th Cir. 2019), from which Pineda-Maldonado quoted, was not the Eleventh Circuit's last word about proving nexus based on family status. In Sanchez-Castro v. U.S. Attorney General, 998 F.3d 1281, 1286-87 (11th Cir. 2021), the Eleventh Circuit distinguished Perez-Sanchez in upholding a finding of no family-status-based nexus. It explained that "Sanchez-Castro's admission that [her alleged persecutors] had a generic pecuniary motive distinguishes her case from Perez-Sanchez." Id. at 1287. By contrast, the court described the petitioner in Perez-Sanchez as having satisfied the nexus requirement based on "evidence that a cartel extorted the petitioner because of his father-in-law's past history with the cartel." Id. (cleaned up). The court then reasoned that that evidence in Perez-Sanchez made it "impossible to disentangle the extortion from the cartel's grievance against the father-in-law," and concluded based on that evidence that there was

- 26 -

The Attorney General does invoke our prior decision in Aguilar-De Guillen to support its contrary position on the nexus issue. But, in Aguilar-De Guillen, we rejected the petitioner's claim of family-status-based persecution because the petitioner "introduced no direct (or circumstantial) evidence that the gang's threats had anything to do with her membership in her husband's family." 902 F.3d at 34. We thereafter cited Sosa-Perez, 884 F.3d 74, for the proposition that "the petitioner offered no direct evidence to support her assertion that the assailants knew that she was a member of the family that she alleges they were targeting, let alone that they attacked her on that basis." Aguilar-De Guillen, 902 F.3d at 34 (cleaned up). By contrast, there is no question that the gang members here knew of Polanco's

"animus . . . per se" based on family status in Perez-Sanchez that was absent in Sanchez-Castro's case. Id. (internal quotation marks omitted). Moreover, Sanchez-Castro also explicitly declined to follow the Fourth Circuit's decision in Hernandez-Avalos, which we discuss above. Id. But, insofar as Sanchez-Castro based its ruling on the fact that "nothing in the record [suggested that the alleged persecutors in that case] harbored animus against the Sanchez-Castro family per se," id., it casts no doubt on our ruling here, given that we have held that proof of such animus need not be shown to satisfy the requirement that the persecution was "on account of" the asylum applicant's familial ties. See Pineda-Maldonado, 91 F.4th at 89. We note, too, that the Attorney General does not take issue with that holding and instead argues only that "the agency [here] properly applied the one central reason standard to the nexus determination, consistent with [our] reasoning [regarding whether animus must motivate persecution] in Pineda-Maldonado."

- 27 -

familial relationship with Lopez.  The Attorney General does not argue to the contrary.

Moreover, in Aguilar-De Guillen, gang members threatened to harm the petitioner if she herself refused to pay monthly "rent" to the gang from her business earnings.  Id. at 30-31.  Here, by contrast, the undisputed record shows that Polanco was solely being threatened by the gang members because a person that the Attorney General does not dispute was her family member -- Lopez -- refused to pay the gang.

Thus, this case is unlike Aguilar-De Guillen, where the petitioner was being targeted for her own actions in refusing to pay the gang.  Instead, it is more like Pineda-Maldonado, in which the petitioner was being targeted "solely due to the 'actions of another family member' . . . and [the petitioner's] familial tie to that family member."  91 F.4th at 87 (quoting Marín-Portillo, 834 F.3d at 102 n.4).[4]

_____

[4] The other cases on which the partial dissent and Attorney General rely are similarly distinguishable.  For one, unlike in Pazine and Penafiel-Peralta, the alleged persecutors here explicitly referenced Polanco's protected grounds in their threats.  See Pazine v. Garland, 115 F.4th 53, 67-68 (1st Cir. 2024); Penafiel-Peralta v. Garland, 115 F.4th 1, 10 (1st Cir. 2024).  And in this case, there is no evidence that suggests that the alleged persecutors believed Polanco herself had access to the funds, Sanchez v. Garland, 74 F.4th 1, 4 (1st Cir. 2023), targeted non-family members, Barnica-Lopez v. Garland, 59 F.4th 520, 531 (1st Cir. 2023), or chose not to target other family members, Sanchez, 74 F.4th at 7; Loja-Tene v. Barr, 975 F.3d 58, 62 (1st Cir. 2020).  While in Jimenez-Portillo two of the petitioners could have argued that they were threatened because of their familial

- 28 -

**5.**

We emphasize that a family tie cannot be merely "incidental, tangential, superficial, or subordinate to" a pecuniary motive of an alleged persecutor to satisfy the nexus requirement. Sanchez-Vasquez, 994 F.3d at 47 (quoting Singh v. Mukasey, 543 F.3d 1, 5 (1st Cir. 2008)). We also recognize that asylum "is restricted to individuals who are . . . unable by their own actions . . . to avoid persecution." Matter of Acosta, 19 I. & N. Dec. 211, 234 (BIA 1985), overruled on other grounds by Matter of Mogharrabi, 19 I. & N. Dec. 439 (BIA 1987); see, e.g., Cece v. Holder, 733 F.3d 662, 669 (7th Cir. 2013) (adopting Acosta's formulation of a particular social group as being "defined by a characteristic that is either immutable or is so fundamental to individual identity or conscience that a person ought not be required to change"); De Pena-Paniagua v. Barr, 957 F.3d 88, 95 (1st Cir. 2020) (citing Acosta's immutable-characteristics test); Diaz-Reynoso v. Barr, 968 F.3d 1070, 1076 (9th Cir. 2020) (quoting Acosta); Canales-Rivera v. Barr, 948 F.3d 649, 654 (4th Cir. 2020); Koudriachova v. Gonzales, 490 F.3d 255, 261 (2d Cir. 2007).

In holding that the record compels a finding that the nexus requirement was satisfied here, we do not overlook those

---

relationship to a person who failed to acquiesce to demands, because they waived those arguments that court did not consider them. Jimenez-Portillo v. Garland, 56 F.4th 162, 168 n.3 (1st Cir. 2022).

requirements. We merely conclude that the record compels the finding that Polanco has met her burden to show that "something that . . . is beyond the power of an individual to change," <u>Acosta</u>, 19 I. & N. Dec. at 233-34 -- namely, her family status -- was at the "root" of the death threats she alleges constituted the past persecution, <u>Barnica-Lopez</u>, 59 F.4th at 530 (quoting <u>Ruiz-Escobar</u>, 881 F.3d at 259).[5] For, although the record indicates that the gang's mistreatment of Polanco would have ended if another member of her family had paid up, nothing in the record indicates that she had the power to bring the mistreatment to an end herself or that any ground other than her membership in a family with Lopez explains why she in particular was targeted for that mistreatment. Rather, the record reveals that, as a means of pressuring Lopez to pay, the gang chose to threaten her in particular with death solely because of her familial tie to him, notwithstanding that the gang

---

[5] We note that "asylum seekers are not required to change immutable characteristics or to abandon their beliefs simply to avoid future persecution." <u>Ahmed</u> v. <u>Keisler</u>, 504 F.3d 1183, 1199 (9th Cir. 2007). Thus, "something that . . . is beyond the power of an individual to change," <u>Acosta</u>, 19 I. & N. Dec. at 233-34, should be construed in line with that understanding. The law does not require family members to, for example, get divorces or leave established partners in order to change their family status and, thus, to avoid persecution. <u>See</u> <u>Orellana-Monson</u> v. <u>Holder</u>, 685 F.3d 511, 518 (5th Cir. 2012) ("To establish persecution based on membership in a particular social group, the petitioners must show that they are members of a group of persons that share a common immutable characteristic that they either cannot change <u>or should not be required to change because it is fundamental to their individual identities or consciences</u>." (cleaned up) (emphasis added)).

did so for the larger end of obtaining money.  Accordingly, the agency's decision finding no nexus between the death threats to Polanco and her status as a family member of Lopez cannot stand, because her status was "a central reason" for those threats being made.[6]

**IV.**

For the foregoing reasons, we **deny** in part and **grant** in part the petition for review of the denial of petitioners' claims for asylum and **remand** for further proceedings consistent with this opinion.

**—Concurring and Dissenting Opinion Follows—**

---

[6] As noted above, the bases in the record for finding past persecution based on family status for Polanco would appear to apply equally to A.A.L.P.  We note as well that Polanco filled in A.A.L.P.'s information on her asylum application and reported that A.A.L.P. was in the United States, but she seems to have left unchecked the answer to, "If in the U.S., is this child to be included in this application?"  We leave it to the parties on remand to address the relevance of what the record shows about A.A.L.P.'s past persecution based on family status to his request for relief from removal.

**KAYATTA**, *Circuit Judge*, concurring in part and **dissenting in part**. The aim of the extortionist is to wrest something, usually money, from the victim. This is done by threatening harm to someone or something about whom the victim cares enough to give up what the extortionist seeks. The universe of persons and things targeted with the threatened harm includes businesses, persons close to the victim (including family members and friends), and even pets. The targets all belong to a single group defined by a single shared characteristic -- the victim's solicitude -- but for which they would not be targeted.

In this case, the extortionists determined that Lopez's partner was someone about whom he cared enough to want to avoid harm to her. Because she is his partner, my colleagues can say that she is a family member.[7] But family membership is neither necessary nor sufficient to account for the threat of harm to Polanco. Rather, it is subordinate to the fact that she is perceived to be in the group of persons and things about whom Lopez cares enough to be extorted. Or at least an IJ could reasonably so find, as here. See Villalta-Martinez v. Sessions, 882 F.3d 20,

---

[7] Lopez and Polanco are not legally married but were at all relevant times intimate partners. They refer to one another as "husband" and "wife" and also share a child together. The BIA presumed in its opinion -- and the Attorney General does not dispute -- that Polanco has a familial relationship to Lopez.

24 (1st Cir. 2018) (explaining that nexus is a "fact-specific determination").

Under our case law, "to ground a viable asylum claim, . . . family membership must be at the root of the persecution, so that family membership itself brings about the persecutorial conduct." Ruiz v. Mukasey, 526 F.3d 31, 38 (1st Cir. 2008); see also Sanchez-Vasquez v. Garland, 994 F.3d 40, 47 (1st Cir. 2021) ("In order to qualify as a 'central reason' for the harm, the ground cannot be 'incidental, tangential, superficial, or subordinate to another reason for harm.'" (quoting Singh v. Mukasey, 543 F.3d 1, 5 (1st Cir. 2008))). We have repeatedly refused to find nexus in situations where members of the same family were threatened for reasons subsidiary or secondary to their family identity. See, e.g., Sanchez v. Garland, 74 F.4th 1, 6-7 (1st Cir. 2023) (substantial evidence supported the conclusion that "financial gain, not family membership, was 'at the root of' threats" made to members of the same family); Jimenez-Portillo v. Garland, 56 F.4th 162, 167-68 (1st Cir. 2022) (substantial evidence supported the conclusion that "the gang targeted [the petitioner] because he refused to assist their criminal enterprise," not because of his family membership); Barnica-Lopez v. Garland, 59 F.4th 520, 531-32 (1st Cir. 2023) (substantial evidence supported the conclusion that threats to members of the same family were motivated by revenge arising out

of a personal dispute, not family membership); Loja-Tene v. Barr, 975 F.3d 58, 62 (1st Cir. 2020) (substantial evidence supported the conclusion that threats to members of the same family were made "out of greed, criminal intent, and vindictiveness, rather than on account of . . . family membership").

The majority seems to give short shrift to these cases and relies instead on Pineda-Maldonado v. Garland, 91 F.4th 76 (1st Cir. 2024). But in Pineda-Maldonado, and unlike in this case, it is clear that the petitioner was targeted precisely because he was his father's son. Id. at 86. In other words, the gang regarded the father's debt to be a blood debt that passed to Pineda-Maldonado only because he was the son. Notably, there is no suggestion that anyone other than the son -- that is to say, friends, acquaintances, or others in the father's circle -- would have been deemed liable for that debt after the father's death.

In fairness, the reconciliation of our precedents in this area falls well short of obvious. But there is substantial evidence here that Polanco's family membership is incidental to the fact that she is within the universe of people dear enough to Lopez to render him susceptible to extortion by the gang members. Imagine, for example, that the gang learned that Lopez hated Polanco and would not be seen as likely to pay a pittance to protect her. She would still be a family member, yet she would likely face no persecution. Or imagine that Lopez and Polanco had

only recently met -- and thus had not yet established any familial ties -- but were in love. She would be just as likely to be persecuted, even though she would not be a family member. And we would certainly not call Lopez's business a family member if it were targeted by the extortionists.

The majority concedes that the gang members likely would have stopped their threats to Polanco if Lopez met their demands. Clearly, animus toward the family is not present here; much less is it so clearly a central reason for the threats as to warrant rejecting the IJ's factual conclusion that it was not. See Villalta-Martinez, 882 F.3d at 27 (1st Cir. 2018) (Barron, J., dissenting) ("[W]e are of course obliged to sustain the BIA's ruling on the 'nexus' issue if it is supported by 'substantial evidence.'" (quoting Nikijuluw v. Gonzales, 427 F.3d 115, 120 (1st Cir. 2005)). Because there is substantial evidence to sustain the agency's finding that Polanco's familial tie to Lopez was not a central reason for the threats aimed at her, I respectfully dissent from the majority's conclusion on this point but concur with its remaining holdings.