**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-1154**

———————

SULMA DE JESUS GUANDIQUE-DE ROMERO; W.A.R.G.; Z.M.R.G.,

      Petitioners,

v.

PAMELA JO BONDI, Attorney General,

      Respondent.

———————

On Petition for Review of an Order of the Board of Immigration Appeals.

———————

Argued:  March 18, 2025                Decided:  August 13, 2025

———————

Before DIAZ, Chief Judge, and WYNN and BENJAMIN, Circuit Judges.

———————

Petition for review granted; reversed in part, vacated in part, and remanded by published opinion.  Judge Wynn wrote the opinion, in which Judge Benjamin joined.  Chief Judge Diaz wrote an opinion concurring in the judgment.

———————

**ARGUED:**  Sarah Shapiro, YALE LAW SCHOOL, New Haven, Connecticut, for Petitioners.  Sarah Abigail Byrd, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Charlotte Lawrence, Caroline Lefever, Quynhanh Tran, Supreme Court Clinic, YALE LAW SCHOOL, New Haven, Connecticut; Paul W. Hughes, Sarah P. Hogarth, MCDERMOTT WILL & EMERY LLP, Washington, D.C.; Simon Y. Sandoval-Moshenberg, MURRAY OSORIO PLLC, Fairfax, Virginia, for Petitioners.  Brian M. Boynton, Principal Deputy Assistant Attorney General, Jennifer Levings, Assistant Director, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

WYNN, Circuit Judge:

Sulma de Jesus Guandique-de Romero petitions for review of the Board of Immigration Appeals' denial of her motion to reopen. The Board concluded that Guandique failed to demonstrate that her previous attorney rendered ineffective assistance of counsel in her removal proceedings. We disagree.

That attorney proposed a legal theory that was foreclosed by controlling precedent. Furthermore, Guandique was prejudiced because her lawyer could have proposed arguments that stood a strong chance of success.

We therefore grant the petition for review, reverse the Board's order denying a new hearing, vacate the Board's order finding Guandique ineligible for asylum and withholding of removal, and remand to the Board with instructions to remand for a new removal hearing.

I.

A.

In February 2012, a gang member in El Salvador told Guandique's husband, William Romero, that he would kill Romero unless Romero paid the gang $3,000.[1] Romero reported the threat to the police, but they told him that "filing a report would only make

_____

[1] This statement of facts is drawn in part from Guandique's affidavit in support of her motion to reopen. The Board relied on this affidavit in its denial of her motion to reopen and did not question its accuracy. To the extent that the government now points to purported inconsistencies between Guandique's affidavit and her prior testimony, the *Chenery* principle dictates that we "may not accept appellate counsel's *post hoc* rationalizations for agency action." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) (citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

2

things worse and that he should just comply." J.A. 71.[2] After the threats continued, Romero fled to the United States while Guandique remained in El Salvador with their two young children.

Around March 2016, Guandique received a call from an unknown man whom she believed was a gang member "because of the way he spoke." J.A. 72. The gang member told her that, unless she paid the gang $500, he would kill her and her children. Guandique said that she "believe[d] they targeted me because they knew I was a woman, and because they knew I was a woman living alone with two kids, and because my husband was in the United States." J.A. 73. The gang member called again the next day. Guandique stated that, when she informed him that she didn't have the money, "he responded that they knew my husband was in the United States and that they knew I could pay them." J.A. 72. She went to the bank and withdrew the money as gang members watched.

The next day, Guandique contacted the police by phone because she was too afraid to go in person. The police told her to either cooperate with the gang or flee. A month later, the same gang member called her and demanded another $500, which she paid. She did the same in May and again in June. Later that year, the gang increased its demand to $800. When Guandique said that she could not raise that much, the gang member told her that they knew she was the treasurer at her children's school and that she should steal the additional money from the school. Guandique explained to the gang that this was a

---

[2] Citations to the "J.A." refer to the Joint Appendix filed under seal by the parties in this appeal.

3

volunteer position that did not give her access to school funds. The gang told her that if she couldn't come up with the $800, she could "pay them in favors to their detained gang members' friends who had not received conjugal visits in a while." J.A. 74.

Guandique told her husband about the increased monetary extortion. She did not tell him about the sexual extortion because she was "ashamed." *Id.* Her husband sent her the money, and Guandique, accompanied by her brother, dropped the money off the next day.

In the months that followed, the gang continued to demand money or sex and continued to threaten her children. By December 2016, Guandique "could not stand living this way anymore" and fled to the United States. J.A. 75. Shortly thereafter, an unknown person approached Guandique's brother in El Salvador and asked where she was. Her brother initially lied but later admitted, under pressure from other gang members, that she was in the United States.

### B.

In the United States, Guandique retained an attorney to represent her in her asylum proceedings. She told the attorney that she had been "sexually extorted (not just financially extorted) and other details . . . but instead of including that information in the asylum application, he simply responded that he was the attorney, that he knew what he was doing, and that [Guandique] should let him do his job." J.A. 76.

4

The attorney helped Guandique apply for asylum as a refugee under 8 U.S.C. § 1158(b)(1)(B)(i).[3] Under that provision, Guandique needed to establish that "membership in a particular social group" ("PSG") was "one central reason" that she was persecuted in El Salvador. *Id.* In her application, counsel wrote that Guandique was targeted "because [her] husband is currently in the US," and that it "is normal practice for Las Pandillas [gang] members to . . . demand money from people whose relatives are in the US." J.A. 569. Her attorney reported that gang members would "use any possible means of torture" if Guandique returned to El Salvador. J.A. 570. The only corroborating evidence he submitted was a letter confirming that Guandique was a volunteer school treasurer and reports detailing gang violence in El Salvador, including the particular dangers that women face from gangs. Before Guandique's removal hearing, Guandique's attorney did not meet with her to prepare and did not inform her of the particular-social-group requirement. He also did not submit a pre-hearing memorandum of law, even though such a filing is encouraged by the Department of Justice practice manual. U.S. Dep't of Just., Off. for Immigr. Review, Immigration Court Practice Manual § 4.19, https://www.justice.gov/eoir/reference-materials/ic/chapter-4/19 [https://perma.cc/BAP7-LTV3].

At Guandique's removal hearing on October 11, 2019, the immigration judge told her attorney, "I did look through the submissions and there's not a whole lot there." J.A.

---

[3] Guandique also included her children as derivatives to her asylum claim. For simplicity, we refer only to Guandique's claim throughout this opinion. *See Villatoro v. Sessions,* 685 F. App'x 242, 242 n.1 (4th Cir. 2017).

5

487. When the immigration judge asked for his proposed PSG, Guandique's attorney responded: "El Salvador citizens whose spouses are gainfully employed in the United States. That's the particular social group I can think of." J.A. 488.

But as the immigration judge later correctly concluded, that proposed PSG was foreclosed by controlling precedent that prohibits wealth-based PSGs. In particular, the judge concluded that "El Salvadorian citizens whose spouses are gainfully employed in the United States is not a cognizable particular social group" because it lacks all three necessary elements: "It lacks immutability, it lacks particularity, and there is insufficient evidence to show that it is socially distinct." J.A. 448. The judge also apparently concluded that there would be no nexus between the gang's threats and *any* PSG: "The Court finds that the gang was motivated by a financial incentive and general criminality rather than any perception of the respondent as being a member of a group larger than herself." J.A. 450.

Guandique's attorney appealed to the Board of Immigration Appeals focusing on the nexus requirement, arguing that Guandique was targeted because her husband lived in the United States and contending that "gang members extort people of money." J.A. 428–29. But he did not address the immigration judge's conclusion that his proposed PSG was non-cognizable.

In August 2023, the Board released a terse opinion denying Guandique's appeal. It "adopt[ed] and affirm[ed]" the immigration judge's decision and quoted a Fourth Circuit case indicating that wealth-based PSGs are not cognizable. J.A. 421 (citing *Lizama* v. *Holder*, 629 F.3d 440, 446 (4th Cir. 2011) (holding that "young, Americanized, well-off

6

Salvadoran male deportees with criminal histories who oppose gangs" is not a cognizable particular social group)).

### C.

In October 2023, represented by new counsel, Guandique moved the Board of Immigration Appeals to reopen her case under 8 U.S.C. § 1229a(c)(7), claiming that she had been prejudiced by her former attorney's ineffective assistance of counsel ("IAC"). She argued that her former counsel failed to submit a plausible PSG and failed to elicit testimony that the gang sexually extorted her. She proposed two alternative PSGs that counsel could have submitted: "immediate family members of William Alfredo Romero" and "women." J.A. 28–29. Had her counsel raised these PSGs, she argued, the immigration judge "could have, to a reasonable probability,[] found nexus." J.A. 30. Guandique also submitted new evidence, including an affidavit detailing the financial and sexual extortion she faced.

In a three-page opinion, the Board denied Guandique's motion to reopen. It found her motion procedurally proper. J.A. 8 (citing *Matter of Lozada*, 19 I. & N. Dec. 637, 638–40 (B.I.A. 1988) (setting forth the procedure for claiming ineffective assistance of counsel)). But it concluded that "the tactical decision of [counsel] to present 'Salvadorian citizens whose spouses are gainfully employed in the United States' as [Guandique's] particular social group does not constitute ineffective assistance of counsel." J.A. 8.

The Board also noted the immigration judge's determination that "the gang was motivated by a financial incentive and general criminality" rather than by Guandique being "a member of a group larger than herself," and concluded that Guandique's motion to

7

reopen "does not articulate a meaningfully different source of the harm." J.A. 8–9. "For example, she explains in her sworn declaration that" she will be raped or killed by gang members if she returns to El Salvador, "[h]ence, the harm she fears is 'because [she] . . . dis [sic] not meet the [gang members'] demands . . . not because she has exhibited a protected characteristic." J.A. 9 (alterations other than [sic] in original). Guandique timely petitioned this Court for review of the order denying her motion to reopen.

## II.

## A.

A noncitizen who seeks asylum must establish that they are a "refugee." 8 U.S.C. § 1158(b)(1)(B)(i). That statutory requirement has three elements: the noncitizen must show "(1) that [they have] suffered past persecution or [have] a well-founded fear of future persecution; (2) that the persecution is 'on account of' [their] race, religion, nationality, membership in a particular social group, or political opinion; and (3) that the persecution is perpetrated by an organization that [their] home country's government is unable or unwilling to control." *Portillo Flores v. Garland*, 3 F.4th 615, 626 (4th Cir. 2021) (en banc) (quoting 8 U.S.C. § 1101(a)(42)(A)). The government does not contest the first and third elements for purposes of this appeal; it argues only that Guandique failed to meet the second element because she was not persecuted on account of membership in a particular social group.

## B.

For all practical purposes, we review de novo the Board's refusal to reopen proceedings for ineffective assistance of counsel, as the government conceded at oral

8

argument. Oral Arg. at 32:00–32:36, https://www.ca4.uscourts.gov/OAarchive/mp3/24-1154-20250318.mp3. To be sure, we generally review for abuse of discretion the Board's refusal to reopen a case, as reopening is a discretionary remedy. *Barry v. Gonzales*, 445 F.3d 741, 745 (4th Cir. 2006). But "the proper standard depends on the *discrete question* we must review, not some broader conclusions the [Board] could have but did not, in fact, draw." *Williams v. Garland*, 59 F.4th 620, 635 (4th Cir. 2023) (emphasis added). So, when the Board denies a motion to reopen based on a legal determination (as opposed to factual or discretionary grounds), we review that conclusion de novo. *Id.* We also review de novo mixed questions of law and fact if "answering [them] entails primarily legal" work. *Id.* at 633 (quotation omitted).

Here, the Board denied Guandique's motion to reopen because it concluded that her former counsel's representation did not amount to ineffective assistance of counsel. "Whether the alleged ineffective assistance of counsel rises to the level of a due process violation presents a mixed question of law and fact, and is therefore subject to de novo review." *Figeroa v. I.N.S.*, 886 F.2d 76, 78 (4th Cir. 1989); *see Gidiglo v. I.N.S.*, 35 F.3d 556, 1994 WL 478106, at *1 (4th Cir. 1994) (unpublished per curiam table decision) (applying de novo review to an IAC claim in a motion to reopen while reviewing other arguments for abuse of discretion); *Fadiga v. Att'y Gen.*, 488 F.3d 142, 153, 163 (3d Cir. 2007) (reviewing de novo an ineffective-assistance-of-counsel claim in a motion to reopen); *Kada v. Barr*, 946 F.3d 960, 964 (6th Cir. 2020) (same); *Iturribarria v. I.N.S.*, 321 F.3d 889, 894 (9th Cir. 2003) (same). So we review that mixed question de novo, and if we determine that Guandique has shown IAC, then the Board will have necessarily abused

9

its discretion. *See Fadiga*, 488 F.3d at 163 ("Because the record . . . establishes that Fadiga was denied due process, the Board abused its discretion by denying the motion to reopen.").

C.

Before analyzing whether Guandique has shown ineffective assistance of counsel here, we must determine whether a noncitizen's Fifth Amendment right to a fundamentally fair removal proceeding can be violated by the ineffective assistance of retained counsel. Previously, we have relied on the Board's recognition that it can rather than taking that position ourselves. *Yang v. Holder*, 770 F.3d 294, 299 n.6 (4th Cir. 2014) ("The [Board] has recognized that '[i]neffective assistance of counsel in a deportation proceeding is a denial of due process.'" (quoting *Matter of Lozada*, 19 I. & N. Dec. at 638)).

But while we have not taken a position on this issue, every other circuit to have addressed the question, save one, has expressly recognized that ineffective assistance of counsel in a removal proceeding can violate a noncitizen's due process rights.[4] Today, we join these other circuits and the Board in concluding that, for noncitizens who manage to

---

[4] *See Ferreira v. Barr*, 939 F.3d 44, 46 n.1 (1st Cir. 2019) ("[C]laims of ineffective assistance in removal proceedings implicate the Due Process Clause of the Fifth Amendment[.]"); *United States v. Perez*, 330 F.3d 97, 101 (2d Cir. 2003) (similar); *Fadiga*, 488 F.3d at 155 (3d Cir. 2007) (similar); *Denko v. I.N.S.*, 351 F.3d 717, 723 (6th Cir. 2003) (similar); *Surganova v. Holder*, 612 F.3d 901, 907 (7th Cir. 2010) (similar); *Mohammed v. Gonzales*, 400 F.3d 785, 793 (9th Cir. 2005) (similar); *Osei v. I.N.S.*, 305 F.3d 1205, 1208 (10th Cir. 2002) (similar); *Ponce Flores v. U.S. Att'y Gen.*, 64 F.4th 1208, 1218 (11th Cir. 2023) (similar); *cf. Diaz v. Sessions*, 894 F.3d 222, 227 (5th Cir. 2018) (holding that the court had jurisdiction over an IAC claim because "IAC is a constitutional claim that involves 'a mixed question of law and fact'" (quoting *Strickland v. Washington*, 466 U.S. 668, 686, 698 (1984))). *Contra Rafiyev v. Mukasey*, 536 F.3d 853, 860 (8th Cir. 2008) ("Our circuit . . . has never recognized a constitutional right to effective counsel in a removal proceeding[.]").

retain an attorney, the right to a fundamentally fair proceeding can be violated by ineffective assistance of counsel.

To be sure, the Sixth Amendment right to effective assistance of counsel only applies to "criminal prosecutions." U.S. Const. amend. VI. But noncitizens have a Fifth Amendment right to due process in removal proceedings. *Anim v. Mukasey*, 535 F.3d 243, 258 (4th Cir. 2008). And although noncitizens are not guaranteed an appointed attorney, they do have the right to retain an attorney. 8 U.S.C. § 1362. Those who retain counsel tend to "rely heavily on their attorney's advice" because "[t]he proliferation of immigration laws and regulations has aptly been called a labyrinth that only a lawyer could navigate." *Nehad v. Mukasey*, 535 F.3d 962, 967 (9th Cir. 2008) (quoting *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005)). A lawyer's bad advice, missed deadlines, or mere failure to prepare could all lead to the deportation of an otherwise asylum-eligible noncitizen. *See Rranci v. Att'y Gen. of U.S.*, 540 F.3d 165, 175 (3d Cir. 2008) (remanding Board denial of motion to reopen where the noncitizen's lawyer "had not done enough research" to "identify any legal theory that might have helped Rranci obtain relief"). Of course, it is unrealistic to expect that lawyers will never make mistakes, and sometimes lawyers make valid tactical decisions that don't work out as expected. Nevertheless, we hold that some legal assistance can be so ineffective as to deny a noncitizen due process of law.

In our vacated opinion in *Afanwi v. Mukasey*, 526 F.3d 788 (4th Cir. 2008), *judgment vacated on other grounds*, 558 U.S. 801 (2009), a prior panel of this court concluded that an immigration attorney's ineffective assistance did not meet the Fifth

11

Amendment's state-action requirement because the "counsel was not a state actor." *Id.* at 798–99. But "because the Supreme Court vacated the entirety of our prior opinion, it has no precedential effect," and we respectfully reach a different conclusion. *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 228 (4th Cir. 2022).

Granted, state action is required because the Fifth Amendment affords protection "only against infringement by governments.'" *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982) (quotation omitted). But the government acts by *conducting* the deportation proceeding. By analogy to the criminal context, "the State's conduct of a criminal trial itself implicates the State in the defendant's conviction." *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980). Thus, the Supreme Court has held state action to exist when "privately retained lawyers" provided ineffective assistance—even in the absence of an allegation "that state officials knew or should have known that" the attorneys were ineffective— because "[w]hen a State obtains a criminal conviction through [a trial tainted by ineffective counsel], it is the State that unconstitutionally deprives the defendant of his liberty." *Id.* at 337, 343. The same principle applies here: the government acted by conducting Romero's deportation hearing, even if it had no reason to know of her attorney's ineffectiveness at that time.

To demonstrate a due process violation in an immigration proceeding, the noncitizen must show "(1) that a defect in the proceeding rendered it fundamentally unfair and (2) that the defect prejudiced the outcome of the case." *Anim*, 535 F.3d at 256. Accordingly, "ineffective assistance" in an immigration case means that counsel was so ineffective as to deny the noncitizen a fundamentally fair removal proceeding. In making

12

that determination, we will consider whether counsel was reasonably competent—just as we do in Sixth Amendment cases—because incompetent counsel is obviously likely to affect whether a noncitizen receives a fundamentally fair hearing. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (adopting the reasonable-competence standard in criminal cases). We seemed to do just that in *Figeroa v. I.N.S. See* 886 F.2d at 79 ("The evidence is clear that [the immigration attorney's] conduct failed to meet even the *minimum level of competence* expected of an attorney under these circumstances." (emphasis added)). Several other circuits use a similar approach.[5] *See Paucar v. Garland*, 84 F.4th 71, 80 (2d Cir. 2023) (a noncitizen "must show that counsel's performance 'fell below an objective standard of reasonableness'" (quoting *Strickland*, 466 U.S. at 688)); *Calderon-Rosas v. Att'y Gen. United States*, 957 F.3d 378, 388 (3d Cir. 2020) ("An alien seeking to reopen his immigration proceedings based on ineffective assistance of counsel must demonstrate that 'competent counsel would have acted otherwise.'" (quoting *Fadiga*, 488 F.3d at 157)); *cf. Lin v. Ashcroft*, 377 F.3d 1014, 1027 (9th Cir. 2004) ("Lin was entitled to have [his] counsel perform with sufficient competence.").

---

[5] Other circuits consult Sixth Amendment case law to flesh out the Fifth Amendment right in immigration cases, even if they do not explicitly consider an immigration attorney's reasonable competence. *E.g.*, *Dearinger ex rel. Volkova v. Reno*, 232 F.3d 1042, 1045 (9th Cir. 2000) (relying on a Supreme Court case even though it "concern[ed] a defendant's Sixth Amendment right to counsel" because it nevertheless "shed[] light on [the court's] inquiry under the Fifth Amendment right to due process"); *Hernandez v. Reno*, 238 F.3d 50, 57 (1st Cir. 2000) ("Sixth Amendment precedent is worth consulting where counsel's performance is attacked in a deportation proceeding, but it is not binding and should not be blindly imported wholesale."); *Paul v. U.S. I.N.S.*, 521 F.2d 194, 198 (5th Cir. 1975) (citing Sixth Amendment precedent to determine whether immigration counsel provided ineffective assistance).

13

The Board itself applied the reasonable-competence standard in denying Guandique's motion to reopen. *See* J.A. 8 (noting that "[t]he Sixth Amendment guarantees reasonable competence" (quoting *United States v. Basham*, 789 F.3d 358, 371 (4th Cir. 2015))). But now, the government seems to change course: it argues that, because the IAC right flows from the Fifth Amendment, the standard is not "whether counsel's performance fell below an objective 'reasonableness' standard," but instead whether the hearing was fundamentally fair. Response Br. at 42 (quoting *Lara-Torres*, 383 F.3d at 974).

While we agree that the ultimate benchmark in Fifth Amendment cases like this one is fundamental fairness, we reject any suggestion that we cannot consider the objective competence of an immigration attorney simply because "[r]emoval proceedings are civil" and therefore "not subject to the full panoply of procedural safeguards accompanying criminal trials." *Id.* at 24 (quoting *Lara-Torres*, 383 F.3d at 973). Aside from the obvious relevance of counsel's competence in determining whether the hearing was fundamentally fair, the "procedural requisites for (a due process) hearing can vary, depending upon the importance of the interests involved." *Fusari v. Steinberg*, 419 U.S. 379, 389 (1975) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 378 (1970)). Removal cases can be, in practice, "death penalty cases in a traffic court setting." Mark A. Drummond, *Death Penalty Cases in a Traffic Court Setting: Lessons from the Front Lines of Today's Immigration Courts*, 44 Litig. News 26, 26 (2018) (statement of Immigration Judge Dana Leigh Marks); *see Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) ("We have long recognized that deportation is a particularly severe 'penalty,'" even though "it is not, in a strict sense, a criminal sanction." (quoting *Fong Yue Ting v. United States*, 149 U.S. 698,

14

740 (1893))). Here, for example, Guandique fears that she will be tortured or killed if she is deported to El Salvador. Although other civil cases can have significant consequences, it's hard to beat the stakes of a removal case. That raises the bar for procedural protections and thus for the performance of counsel.

In sum, courts evaluating whether a noncitizen was denied their Fifth Amendment right to a fundamentally fair removal proceeding should consider whether immigration counsel was reasonably competent.

As for prejudice, we agree with the parties that the test is the same as under the Sixth Amendment: a petitioner is prejudiced when there is a reasonable probability that the outcome of their case would have been different with a competent lawyer. *See Rranci*, 540 F.3d at 175–76 (3d Cir.) (applying the reasonable-probability test to an immigration IAC case).

### III.

Guandique was denied a fundamentally fair hearing by the performance of her original attorney. At the time of Guandique's removal hearing, counsel's proposed PSG of "El Salvador citizens whose spouses are gainfully employed in the United States" was, under our precedent and the Board's, dead on arrival. Furthermore, Guandique was prejudiced by this error. She proposes two alternative PSGs: "immediate family members

15

of William Alfredo Romero" and "El Salvadoran women living under gang control."[6] Both PSGs are likely cognizable under our precedent, and the record contains evidence sufficient to support a finding that these PSGs were "*at least one* central reason for her persecution." *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 950 (4th Cir. 2015).

Thus, for the reasons given below, we conclude that Guandique received ineffective assistance of counsel, and remand to the Board with instructions that it grant her motion to reopen and remand for a new hearing before an immigration judge.[7]

A.

The duty of a counsel to provide effective assistance includes "the duty to investigate and to research a client's case in a manner sufficient to support *informed legal judgments*." *United States v. Carthorne*, 878 F.3d 458, 466 (4th Cir. 2017) (emphasis added). In particular, "ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance." *Id.* (quoting *Hinton v. Alabama*, 571 U.S. 263, 274 (2014)). By proposing only a clearly foreclosed legal theory, Guandique's former counsel failed to

---

[6] The latter PSG is somewhat different from the one that Guandique's new counsel proposed in her motion to reopen. *See* J.A. 28 (proposing a PSG of "women"). We need not resolve whether that difference is significant because the government doesn't object and therefore "forfeited any such forfeiture argument." *United States v. Newby*, 91 F.4th 196, 200 n.* (4th Cir. 2024).

[7] In addition to seeking asylum, Guandique applied for withholding of removal and protection under the Convention Against Torture. We do not address those claims because we conclude she received ineffective assistance on her asylum claim, which suffices for us to order a full merits rehearing. For the same reason, we do not address her other arguments for ineffective assistance beyond the PSG error.

16

clear that low bar and doomed Guandique's claim from the very beginning of her hearing, thus rendering the proceeding fundamentally unfair.

An asylum applicant must demonstrate that they were persecuted due to their membership in a PSG that is "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Del Carmen Amaya-De Sicaran v. Barr*, 979 F.3d 210, 214 (4th Cir. 2020) (quotation omitted).

Counsel proposed that Guandique was a member of the PSG "El Salvador citizens whose spouses are gainfully employed in the United States." J.A. 488. But in *Lizama v. Holder*, 629 F.3d 440 (4th Cir. 2011), we rejected a proposed PSG of "young, Americanized[,] well-off[,] Salvadoran male deportees with criminal histories who oppose gangs." *Id.* at 442. We held that wealth doesn't "'provide an adequate benchmark for determining group membership' nor embody concrete traits that would readily identify a person as possessing these characteristics." *Id.* at 447 (quoting *In Re A–M–E & J–G–U*, 24 I. & N. Dec. 69, 76 (BIA 2007)). And, citing a 1985 Board decision, we noted as an example that being a taxi driver is not an immutable characteristic because one could always "chang[e] jobs." *Id.* (citing *Matter of Acosta*, 19 I. & N. Dec. 211, 234 (B.I.A. 1985), *overruled on other grounds by Matter of Mogharrabi*, 19 I. & N. Dec. 439 (B.I.A. 1987)). Thus, Lizama's proposed PSG was not "enduring enough" to be cognizable. *Id.* at 448. The Board had similarly rejected a PSG of "affluent Guatemalans" as insufficiently immutable. *In Re A-M-E & J-G-U*, 24 I. & N. at 69.

17

Counsel's modifier of "gainfully employed" was therefore a clear and fatal mistake because it invoked wealth- or employment-based distinctions which had been repeatedly rejected. That demonstrates ineffective assistance. Similarly, we held in a habeas case that an attorney provided ineffective assistance when he failed to object to a sentencing enhancement because he "demonstrated that he was not even aware of the analysis required"—even though, on the habeas petitioner's direct appeal, we had held that "existing precedent did not require a conclusion" that application of the enhancement was clearly erroneous. *Carthorne*, 878 F.3d at 463, 468. Here, the government does not even argue that counsel's PSG was colorable. Instead, the government contends that it wasn't "an *egregiously* frivolous legal argument," which does not meet any legal standard that we are aware of. Response Br. at 30 (emphasis added).

Taking a slightly different tack, in its order denying Guandique's motion to reopen, the Board asserted—with no analysis and citing no evidence—that counsel's proposed PSG was a "tactical decision." J.A. 8. Before this Court, the government argues that counsel was attempting to strengthen the causal link (or "nexus") between Guandique's persecution and her PSG. *See* Response Br. at 28 (analogizing to a partial dissent concluding that a noncitizen's "inclusion of the modifier young was likely a calculated attempt to strengthen his position on the required nexus between his persecution and his membership in his proposed group. . . . The problem though is by attempting to strengthen his nexus argument, [the noncitizen] weakened his particularity and social distinction arguments to the point that his group is not legally cognizable." (quoting *Garcia v. Garland*, 73 F.4th 219, 236 n.5 (4th Cir. 2023) (Quattlebaum, J., dissenting in part and concurring in part))).

18

To be sure, we generally defer to an attorney's "reasonable tactical decision." *Massis v. Mukasey*, 549 F.3d 631, 636 (4th Cir. 2008), *abrogated on other grounds by Santos-Zacaria v. Garland*, 598 U.S. 411 (2023); *see Grueninger v. Dir., Va. Dep't of Corr.*, 813 F.3d 517, 529 (4th Cir. 2016) ("We recognize that review of counsel's performance under *Strickland* is deferential, respecting the 'wide latitude counsel must have in making tactical decisions.'" (quoting *Strickland*, 466 U.S. at 689)).

But "[s]teering a client into . . . a dead-end is not a 'tactical decision.'" *Salazar-Gonzalez v. Lynch*, 798 F.3d 917, 919 (9th Cir. 2015). So, our decision in *Massis v. Mukasey* is distinguishable. There, "[g]iven the state of the law [at the time of the removal hearing], it was not unreasonable for Massis's original counsel to" make a particular choice. 549 F.3d at 637. It was only *after* Massis's hearing that "courts of appeals subsequently began to reach a contrary conclusion." *Id.*

Here, counsel's proposed PSG was foreclosed by law existing at the time of Guandique's hearing. And counsel's failure on appeal to the Board to even challenge the rejection of that PSG supports our conclusion that he provided ineffective assistance. "We are therefore disinclined to accept the [government]'s invitation to engage in after-the-fact rationalization of a litigation strategy that almost certainly was never contemplated." *Tice v. Johnson*, 647 F.3d 87, 105 (4th Cir. 2011).

The government additionally argues that, even if counsel's proposed PSG was a "poor tactical decision, it did not amount to ineffective assistance because Ms. Guandique still had a fundamentally fair hearing at which she was asked open-ended questions and given a full opportunity to explain the basis for her asylum claim." Response Br. at 30. But

19

Guandique's counsel specifically declined to assert "any other protected grounds" for her asylum beyond the facially deficient PSG, and the government cites no authority for the proposition that Guandique could have somehow altered counsel's PSG via her testimony. J.A. 489. Counsel therefore sunk Guandique's claim from the beginning of her hearing; the hearing hardly became "fundamentally fair" because she was later asked open-ended factual questions.

## B.

Though Guandique has established that her counsel provided ineffective assistance, she still must show prejudice—i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. We conclude that she meets this burden because her two proposed alternative PSGs would have stood a reasonable chance of success.

Guandique first proposes an alternative PSG of "immediate family members of William Alfredo Romero." Opening Br. at 44. This PSG was cognizable because we had established several years before her hearing that "an individual's membership in her nuclear family is a particular social group," *Velasquez v. Sessions*, 866 F.3d 188, 194 (4th Cir. 2017), and that "the family provides 'a prototypical example of a particular social group,'" *Crespin-Valladares v. Holder*, 632 F.3d 117, 125 (4th Cir. 2011) (quoting *Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir. 1986)).

But here the Board found that, even if this PSG would have been cognizable, Guandique would not have been able to show a nexus between the PSG and her persecution. In its order denying Guandique's motion to reopen, the Board noted that "[t]he

20

Immigration Judge . . . determined that 'the gang was motivated by a financial incentive and general criminality rather than any perception of the respondent as being a member of a group larger than herself.'" J.A. 8 (quoting J.A. 450). The Board concluded that "the harm she fears is because she did not meet the" gang member's demands, "not because she has exhibited a protected characteristic." J.A. 9 (cleaned up). The government now urges us to grant deference to the "Immigration Judge's explicit finding of fact." Response Br. at 50.

There are two problems with the Board's analysis. First, the Board did not apply the correct nexus standard. The proper standard, which neither the Board nor the immigration judge cited, is whether Guandique's membership in a PSG is "at least one central reason" "why she, and not another person" was targeted for extortion in the first place. *Hernandez-Avalos*, 784 F.3d at 950. Asserting that the gang was motivated by a financial incentive or general criminality does not answer that question.

We considered a similar error in *Hernandez-Avalos v. Lynch*. There, Hernandez asserted the PSG of "her nuclear family," claiming that gang members threatened to kill her if she did not allow her son to join their gang. *Id.* at 949. The Board rejected her argument because "[s]he was not threatened because of her relationship to her son (i.e. family), but rather because she would not consent to her son engaging in a criminal activity." *Id.* at 949. The gang members were surely motivated by criminality or financial incentives when they demanded that Hernandez's son be allowed to join the gang. We nevertheless vacated, holding that "Hernandez's relationship to her son *is why she, and not another person*, was threatened with death if she did not allow him to join [the gang], and

21

the gang members' demands leveraged her maternal authority to control her son's activities." *Id.* at 950 (emphasis added). We stated that the Board's "conclusion . . . draws a meaningless distinction under these facts" and that it was "unreasonable to assert that the fact that Hernandez is her son's mother is not *at least one* central reason for her persecution." *Id.*

The same reasoning applies here. Guandique presented evidence indicating that she was targeted in part because her "husband was in the United States." J.A. 73. The gang member told her "that they knew my husband was in the United States and that they knew I could pay them." J.A. 72. At the hearing, she testified that she was targeted because "they said to me, your husband is [in the United States], and I was receiving money from him." J.A. 499. This testimony, which the immigration judge found credible, supported that Guandique's relationship to her husband was "at least one central reason for her persecution." *Hernandez-Avalos*, 784 F.3d 944, 950.

Second, the Board "did not adequately consider the impact of counsel's ineffectiveness when it relied on the IJ's . . . findings in evaluating prejudice" because those findings were "tainted" by counsel's failure to develop the record. *Paucar*, 84 F.4th at 82 (remanding for a new hearing in part because the Board relied on an immigration judge's factual findings made when petitioner was represented by ineffective counsel). As a result of counsel's ineffectiveness, the record presented to the immigration judge was underdeveloped, as the judge alluded to at the hearing. *See* J.A. 487 ("I did look through the submissions and there's not a whole lot there."). The immigration judge couldn't fairly evaluate whether Guandique could establish a nexus to a hypothetical PSG based on an

22

underdeveloped record, so it was unreasonable for the Board to rely on that "finding." Response Br. at 50.

In addition to this first alternative PSG, Guandique proposes a PSG of "El Salvadoran women living under gang control." Opening Br. at 47. This PSG was likely cognizable. In *Alvarez Lagos v. Barr*, 927 F.3d 236 (4th Cir. 2019), which we issued four months prior to Guandique's hearing, we reversed the denial of a similar PSG: "unmarried mothers in Honduras living under the control of gangs." *Id.* at 245. We noted that "'[t]he size and breadth of a group alone does not preclude a group from qualifying as [a particular] social group,' and the IJ's contrary determination was in error." *Id.* at 253 (quoting *Perdomo v. Holder*, 611 F.3d 662, 669 (9th Cir. 2010)).

There is also a reasonable probability that a different lawyer could have established a nexus between this PSG and Guandique's persecution. We found a nexus in *Alvarez Lagos* where gang members called the petitioner a "whore" and threatened to rape her and her daughter if she did not pay. 927 F.3d at 244, 250–51. Similarly, Guandique believes she was targeted in part because "they knew I was a woman, and because they knew I was a woman living alone with two kids." J.A. 73. In support of that proposition, she notes that the gang made gendered threats against her and her daughter: the gang informed her that, if she couldn't meet their increased financial demands, she could "pay them in favors to their detained gang members' friends who had not received conjugal visits in a while," J.A. 74; a gang member "t[old] me that if I did not want to pay him anymore, I could go with them and do sexual acts and that he promised to give me a good time," J.A. 75; and the same gang member later told her that "they knew which school my daughter went to,"

23

which made her "fear[] it was just a matter of time before they tried to take my daughter away from me to use her for forced sex," J.A. 72, 75. Guandique also submitted a report published by Human Rights Watch and a news article explaining that gangs in El Salvador sexually target women and girls, and another article reporting that women experience not only "financial extortion" but "a more insidious form of extortion shaped by the threat of sexual violence." J.A. 294.

The government attempts to distinguish *Alvarez Lagos* by noting that "it was a different country and centered heavily around the petitioner's status as unmarried." Response Br. at 35. Those distinctions are without meaningful difference. Like the petitioner in *Alvarez Lagos*, Guandique has submitted evidence tending to show that she was targeted in part because she was a woman living under gang control. Although the petitioner in *Alvarez Lagos* was unmarried, that fact was significant because the petitioner was particularly "vulnerable to gang violence" when she was "without the protection of a 'dominant male'"—just as Guandique says she was left without the protection of her husband when he emigrated to the United States. *Alvarez Lagos*, 927 F.3d at 250.

Because Guandique has put forth two plausible alternative PSGs that were available to her counsel and for which she likely could have shown nexus, she has demonstrated a reasonable probability of a different result had her case been in the hands of a different attorney. She has therefore established prejudice for purposes of her IAC claim.

IV.

We conclude that Guandique was denied a fundamentally fair removal hearing by the ineffective representation of her former counsel. The Board's denial of her motion to

24

reopen based on a contrary conclusion was error. We therefore grant Guandique's petition for review, reverse the Board's denial of her motion to reopen, vacate the Board's denial of her asylum and withholding-of-removal claims, and remand to the Board with instructions to remand for a new hearing.

*PETITION FOR REVIEW GRANTED; REVERSED*
*IN PART, VACATED IN PART, AND REMANDED*

DIAZ, Chief Judge, concurring in the judgment:

If there are two ways to resolve a case—one constitutional, one not—we ought to pick the latter if we can. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). In their haste to break new constitutional ground, my colleagues disregard that rule. I would honor it. Because we can grant Sulma Guandique's petition without deciding fraught and complex Fifth Amendment questions, we should do that and no more.

I.

As the majority recognizes, the *Chenery*[1] doctrine limits our review to the reasons the Board of Immigration Appeals gave for refusing to reopen Guandique's case. *Hernandez-Cruz v. Holder*, 651 F.3d 1094, 1109–10 (9th Cir. 2011); *see INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) (per curiam). The Board relied exclusively on Sixth Amendment caselaw when it decided that Guandique's lawyer didn't render deficient performance.

The Board's reasoning allows us to resolve this case without holding that "for noncitizens who manage to retain an attorney, the right to a fundamentally fair proceeding can be violated by ineffective assistance of counsel." Majority Opinion at 10–11. The Board denied Guandique's motion "on the merits," "whether or not the Constitution require[d]" it to do so; "basic principles of administrative law" required the Board to make

---

[1] *SEC v. Chenery Corp.*, 318 U.S. 80 (1943).

that decision "carefully and rationally." *Magala v. Gonzales*, 434 F.3d 523, 526 (7th Cir. 2005).

This the Board did not do. Its deficient-performance holding was itself deficient. True, our ineffective assistance cases give great deference to "reasonable tactical decision[s] by counsel." *Massis v. Mukasey*, 549 F.3d 631, 636 (4th Cir. 2008). Choosing a particular social group in asylum cases is a strategic matter.

But that deference has limits. Lawyers can pick good strategies; they can pick bad strategies. They can't pick doomed strategies.

The Board ignored that possibility. It acknowledged that strategic decisions are owed "a 'strong presumption' of reasonableness." J.A. 4. But the Board never asked whether that presumption could be overcome. Instead, it made a strong presumption absolute. That isn't reasoned decision-making.

The Board's prejudice decision was wrong on its own terms, too. It rested on the immigration judge's findings, without considering whether those findings might have been tainted by Guandique's inept counsel. Nor did the Board apply the correct nexus standard when deciding whether Guandique had a reasonable chance of success on reopening.

The government doesn't attempt to defend the Board's reasoning. Instead, it tries to replace the Board's reasonableness standard with a fundamental fairness standard that the Board didn't consider, apply, or adopt.

*Chenery* forecloses that effort. "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."

*Chenery*, 318 U.S. at 87. The Board never applied the government's fundamental fairness test, so neither should we.

I would correct the Board's legal errors (as the majority does in Parts III.A and B), grant Guandique's petition, and remand. That's all we need to say to end this case, "and the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further." *PDK Lab'ys Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment).

## II.

Still, my colleagues rush ahead to a constitutional holding. But this case is a bad vehicle to do so, and I'm not confident in the majority's conclusion.

## A.

The parties barely addressed the constitutional right the majority mints. And neither side disputed its existence. The government evaded the question. It conceded, at most, that ineffective assistance "may provide a basis for reopening removal proceedings." Resp't's Br. at 24. It noted that our circuit held otherwise in *Afanwi v. Mukasey*, but it didn't ask us to either follow or reject that now-vacated decision. *Id.* at 24 n.9 (discussing *Afanwi*, 526 F.3d 788 (4th Cir. 2008), *vacated and remanded*, 558 U.S. 801 (2009)).

Guandique, for her part, presumed that the Fifth Amendment gives her a remedy for ineffective assistance without arguing for it in so many words. But she didn't acknowledge *Afanwi*, much less grapple with it.

28

Both parties, then, assumed that the Fifth Amendment has something to say about ineffective assistance of counsel in deportation proceedings. The issue was never properly presented to us, let alone contested, briefed, and argued.

Small wonder, then, that the majority's constitutional holding leaves critical questions unanswered.

To be sure, the opinion adopts the view of most of our sister circuits. Still, constitutional meaning can't be decided by just counting noses. We've said that due process can be violated in immigration court if "a defect in the proceeding rendered it fundamentally unfair and . . . that the defect prejudiced the outcome of the case." *Anim v. Mukasey*, 535 F.3d 243, 256 (4th Cir. 2008). Still, that test doesn't explain why certain kinds of defects, but not others, make a proceeding "fundamentally unfair." And neither does the majority. We should rely on more than intuition to recognize a new due process right.

The majority observes that counsel in removal proceedings can significantly harm an immigrant through incompetence. That's true. Deportation proceedings can have sky-high, life-and-death stakes. But lives are also on the line in post-conviction criminal proceedings, and the Supreme Court has held that habeas petitioners with "no constitutional right to counsel" "[cannot] be deprived of the effective assistance of counsel." *Wainwright v. Torna*, 455 U.S. 586, 587–88 (1982) (per curiam); *see Coleman v. Thompson*, 501 U.S. 722, 752–53 (1991) (capital case).

The majority also mentions that immigrants are entitled by statute to the retained counsel of the immigrant's choice. *See* 8 U.S.C. § 1362. But I don't see how that

29

distinguishes ordinary civil litigation. Parties there have the same right. *See In re Bellsouth Corp.*, 334 F.3d 941, 955 (11th Cir. 2003); *Cole v. U.S. Dist. Ct.*, 366 F.3d 813, 817 (9th Cir. 2004). If § 1362 were enough to ground a right to effective assistance, the majority's holding would constitutionalize the whole tort of malpractice.

The majority's only response is that due process requires different safeguards "depending upon the importance of the interests involved." Maj. Op. at 14 (quoting *Fusari v. Steinberg*, 419 U.S. 379, 389 (1975)). Again, true, but unpersuasive.

The majority doesn't explain why due process gives no remedy for ineffective assistance in every civil context except deportation. Harsh and cruel as deportation can be, are the interests there intrinsically more important than those in, say, a § 1983 lawsuit seeking exculpatory evidence, *see, e.g.*, *Skinner v. Switzer*, 562 U.S. 521, 529 (2011), or (harsher yet) in a discretionary state appeal by a prisoner? *E.g.*, *Torna*, 455 U.S. at 587–88. The majority doesn't say.

In the end, it seems to be the background rule that "if a petitioner does not have a right to counsel, then it is not a constitutional violation to receive ineffective assistance." *Simon v. Gov't of V.I.*, 929 F.3d 118, 131 (3d Cir. 2019). And as the majority seems to accept, immigrants in removal proceedings have no right to counsel. *See Gandarillas-Zambrana v. Bd. of Immigr. Appeals*, 44 F.3d 1251, 1256 (4th Cir. 1995); *Hernandez v. Reno*, 238 F.3d 50, 55 (1st Cir. 2001). I'm left unsure how to square the circle.

## B.

I'm more (but not entirely) convinced by the majority's rejection of *Afanwi*. That case held that an immigrant's lawyer "cannot violate his client's Fifth Amendment rights

30

unless he can be said to be engaging in state action," and that privately retained counsel "[is] not a state actor." *Afanwi*, 526 F.3d at 798–99.

*Afanwi*'s logic can't be right as a general matter. When retained counsel renders ineffective assistance in a criminal trial, the criminal trial is state action, and the state "unconstitutionally deprives the defendant of his liberty" when it "obtains a criminal conviction" by such flawed proceedings. *Cuyler v. Sullivan*, 446 U.S. 335, 343 (1980).

But the majority's rule can't be right either. Judicial action is state action. *Shelley v. Kraemer*, 334 U.S. 1, 14–18 (1948). Yet courts (including ours) have refused to constitutionalize all private misconduct leading to a judgment. Such a rule "could result in almost all private acts taken into account by government actors being deemed state action." *Monroe v. City of Charlottesville*, 579 F.3d 380, 389 (4th Cir. 2009). We haven't approached the state action problem so breezily, and neither have our sister circuits. *See, e.g., Ohno v. Yasuma*, 723 F.3d 984, 987 (9th Cir. 2013); *United Egg Producers v. Standard Brands, Inc.*, 44 F.3d 940, 942–43 (11th Cir. 1995).

The state action puzzle before us isn't whether the government acted when it denied Guandique's application for asylum. It's whether the performance of Guandique's private counsel can be imputed to the state. In criminal cases, the Sixth Amendment itself requires imputation. *See Coleman*, 501 U.S. at 754. If the Fifth Amendment demands the same result, the majority doesn't explain why.

As it happens, *Torna* might have rejected for the Fourteenth Amendment what the majority accepts for the Fifth. In that case, Torna was convicted of several felonies in Florida state court. 455 U.S. at 586. Torna's state-court lawyer missed the deadline to ask

31

Florida's high court for discretionary review, and Torna argued on habeas that his lawyer's negligence deprived him of the effective assistance of counsel. *Id.* at 586–87.

The Supreme Court held that Torna had no right to effective assistance on discretionary appeal because he had no underlying right to counsel in that context. *Id.* at 587–88. But the Court also held that Torna's due process rights weren't violated. Even if counsel's misconduct deprived Torna of a due process interest, the Court reasoned, that deprivation "was caused by [Torna's] counsel, and not by the State." *Id.* at 588 n.4.

*Cuyler* and *Torna*'s state action holdings aren't easy to reconcile. *See id.* at 590 (Marshall, J., dissenting). And an unreasoned footnote in a per curiam opinion is a slender reed on which to rest a case. Still, I don't think the *Torna* footnote is dictum—and even if it were, we'd be "obliged to afford [it] great weight." *Fusaro v. Cogan*, 930 F.3d 241, 254 (4th Cir. 2019) (cleaned up). The majority doesn't acknowledge that conundrum, but I think it warrants our (and the parties') attention.

\*       \*       \*

Maybe the majority's constitutional holding is right. Were the due process issue fully litigated, I might get there. But the question is debatable enough, and important enough, that we shouldn't shoot from the hip. The Board applied a Sixth Amendment

32

reasonable-competence standard, and we can assess its application of that standard without deciding any questions of constitutional law.[2] *See Magala*, 434 F.3d at 526.

When we can avoid constitutional holdings, we should. That rule of prudence is "more deeply rooted than any other in the process of constitutional adjudication." *Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944). Because the majority charts a different course, I can't join its opinion. So although I, like my respected colleagues, would grant Guandique's petition, I concur only in the judgment.

---

[2] That's why the Supreme Court vacated our decision in *Afanwi*. As then–Solicitor General Kagan explained, "[t]he Board has recognized an administrative remedy for deficient performance by counsel" for decades, and so Afanwi could be "entitled to administrative relief as a result of his attorney's error," whatever the Constitution has to say on the matter. Brief for Respondent at 14–15, *Afanwi v. Holder*, 558 U.S. 801 (2009) (No. 08-906), 2009 WL 2625869. She suggested that the Court remand to let the Board decide Afanwi's claim on the merits, *id.* at 16, and that's just what the Court did. *Afanwi v. Holder*, 558 U.S. at 801.